Jean Powell GIBBS, Widow of Boyd John (Bill) Gibbs, Deceased,

v.

**UNITED STATES of America.**

Civ. A. No. 5206.

United States District Court
E. D. Tennessee, N. D.

Dec. 29, 1965.

G. Edward Friar, Knoxville, Tenn., Bruce C. Bishop, Foltz, Bishop, Thomas, Leitener & Mann, Chattanooga, Tenn., for plaintiff.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., G. Wilson Horde, Asst. U. S. Atty., Knoxville, Tenn., Wallace E. Maloney, Atty., Dept. of Justice, Washington, D. C., for defendant.

ROBERT L. TAYLOR, Chief Judge.

This is an action filed under the Federal Tort Claims Act (28 U.S.C. § 2674)[1] by Mrs. Jean Powell Gibbs against the United States to recover damages for the death of her husband, who was killed in an airplane accident at Gainesville, Florida on February 3, 1964.

The action is based on an alleged violation of Chapter 768, Florida Statutes (1963) Sections 768.01 and 768.02, F.S.A., which is the Florida wrongful death statute.

The following facts were stipulated:

South Central Airlines Flight 510 on February 3, 1964 was a scheduled flight from Ocala, Florida to Jacksonville, Florida with an intermediate stop at Gainesville. Plaintiff's decedent, Boyd John Gibbs, boarded Flight 510 at Gainesville, Florida and was one of the nine passengers on board at the time of the crash. After nine passengers were boarded, in addition to the pilot, which made a total of ten persons and baggage on board, the airplane, Twin Beech N2999, taxied out for take-off on Runway 06 at Gainesville, Florida. The take-off was with flaps in the full down position (45 degrees). Thereafter, the landing gear was retracted and the airplane climbed to approximately 200 feet, whereupon the airplane stalled and crashed to the ground at the departure end of Runway 06. The airplane, at the time of take-off, had a total gross weight of 9402.2 pounds, which was apportioned as follows:

| | |
|---|---|
| Aircraft empty weight | 6379.1 lbs. |
| oil (13½ gal.) | 99.9 lbs. |
| fuel (127 gal.) front tanks | 744.2 lbs. |
| fuel (50 gal.) rear tanks | 293.0 lbs. |
| pilot Thompson | 172.0 lbs. |
| passenger Servos | 135.0 lbs. |
| passenger Mary Eaton | 110.0 lbs. |
| passenger Anderson | 169.0 lbs. |
| passenger MacKay | 172.0 lbs. |
| passenger Dennis Eaton | 180.0 lbs. |
| passenger Legate | 178.0 lbs. |
| passenger Cowperthwaite | 150.0 lbs. |
| passenger Willingham | 185.0 lbs. |
| passenger Gibbs | 205.0 lbs. |
| baggage (nose compartment) | 130.0 lbs. |
| baggage (aft compartment) | 100.0 lbs. |
| | 9402.2 lbs. |

With the total gross weight of 9402.2 pounds and with the loading apportioned as set forth above, the center of gravity of the airplane was 124.7 inches aft of the datum line. With the landing gear in the up (fully retracted) position, the center of gravity was 125.9 inches aft of the datum line. At the time of take-off, the persons and baggage on board were placed and weighed as follows:

1. Pilot Thompson weighed 172 lbs. and was seated in the pilot's seat (Seat No. 1) that is, the left seat in the cockpit (left side of the aircraft as looking from tail to nose).

2. Passenger Servos weighed 135 lbs. and occupied the seat beside Captain Thompson (Seat No. 2) or the first seat on the forward righthand side of the aircraft.

3. Passenger Mary Eaton weighed 110 lbs. and occupied Seat No. 3 which was the seat behind Captain Thompson on the lefthand side of the aircraft.

4. Passenger Anderson weighed 169 lbs. and occupied Seat No. 4 which was the seat on the righthand side of the aircraft behind the co-pilot's seat occupied by passenger Servos.

---

[1] "2674. *Liability of United States*

"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

"If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof."

5. Passenger MacKay weighed 172 lbs. and occupied Seat No. 5 on the lefthand side of the aircraft which was the seat behind that occupied by passenger Mary Eaton.

6. Passenger Dennis Eaton weighed 180 lbs. and occupied Seat No. 6 on the righthand side of the aircraft which was the seat behind that occupied by passenger Anderson.

7. Passenger Legate weighed 178 lbs. and occupied Seat No. 7 on the lefthand side of the aircraft which was the seat behind that occupied by passenger MacKay.

8. Passenger Cowperthwaite weighed 150 lbs. and occupied Seat No. 8 on the right side of the aircraft which was the seat behind that occupied by passenger Dennis Eaton.

9. Passenger Gibbs weighed 205 lbs. and occupied Seat No. 10 on the righthand side of the aircraft which was the seat behind that occupied by passenger Cowperthwaite.

10. Passenger Willingham weighed 185 lbs. and occupied Seat No. 9 on the lefthand side of the aircraft which was the seat behind that occupied by passenger Legate.

11. There was 130 lbs of baggage in the nose baggage compartment.

12. There was 100 lbs of baggage in the aft baggage compartment.

All ten persons aboard were killed and the airplane was destroyed by impact and the subsequent fire.

■ Plaintiff contends that the Federal Aviation Agency, an agency of the Government, was negligent in the following respects:

(1) It negligently certified, licensed and allowed one Homer Thompson to pilot the airplane which crashed.

This contention was abandoned during the trial according to the Court's understanding. If mistaken in this understanding, no proof was introduced to support the contention and, therefore, the Court must conclude that it is lacking in merit.

(2) The Federal Aviation Agency negligently approved certified and licensed South Central Airlines to operate under an air taxi permit, (air taxi line being an airline that serves the smaller cities and connects with the major airlines at larger cities.)

(3) The Federal Aviation Agency negligently approved and certified the airworthiness of the Twin Beech Craft aircraft identified as N2999 when, as a matter of fact, the aircraft was not airworthy after it was modified or altered. In that connection, plaintiff says that by reason of the alterations and load on the date of the crash, the center of gravity was moved to a point about 124.7 inches aft of the datum line, whose center of gravity when empty was 114.53 inches aft of the datum line, which was far beyond the margin of safety.

Defendant denies that any of its agents or servants breached any provision of the Federal Aviation Act or any regulation issued thereunder, but contends that if they did, such would not give rise to a cause of action by plaintiff or any other individual. Defendant contends that the cause of the accident was pilot error and that since the pilot was not an employee of the Government, his error is not chargeable to the Government.

South Central Airlines originally operated in Charlotte, North Carolina in the air taxi service. A new Air Taxi Operator Certificate was issued to it when it moved its operations to Ocala, Florida, with an effective date of December 20, 1963. The Certificate called for an Operations Manual acceptable to the Federal Aviation Agency. It also provided that the Manual should be maintained in current status "and shall be readily available to all flight and ground personnel while in the performance of their respective duties. The St. Petersburg, Florida General Aviation District Office shall be furnished a copy of the Opera-

tions Manual and copies of all revisions and/or amendments as they occur." The Certificate likewise provided that the Manual should contain instructions, information and data pertaining to take-off, "en route and landing weight limits when applicable" and "loading schedules or other methods and procedures for determining that the airplane is loaded within the allowable gross weight and center of gravity limits." (Plaintiff's Exhibit 12.)

Sam Caester, President of South Central Airlines, agreed to furnish the FAA a skeleton manual immediately, and a full manual in about six months after the Certificate was delivered. The Certificate was delivered without the skeleton manual. The amended Certificate required South Central to notify FAA before a new airplane was put into operation. The Charlotte Certificate was issued without an Operating Manual. The Manual was in the process of completion at the time of the accident.

Beechcraft N2999 was modified in the name of its owner, Leeward & Hart Aeronautical Corporation, and Charles M. Carrier, FAA inspector, on January 28, 1964 accepted the projected modifications as complying with the applicable airworthy requirements. (Plaintiff's Exhibit 9.)

The alterations consisted of changes in the baggage compartment located towards the rear of the airplane, installation of a single seat on the left side of the fuselage and removal of the original bulkhead web at Station 9 from approximately 4½" to the right of the centerline to the left side of the fuselage. A detailed account of the alterations is shown on pages 1 and 2 of Exhibit 9. The alterations increased the gross weight from 8750 pounds to 9360 pounds. The alterations met the minimum design requirements and were approved by Charles Faller, Supervisor of Engineering and Manufacturing of the District Office of FAA in Miami. The design data furnished by the owner of the airplane was evaluated by qualified engineers who worked in the Miami FAA office.

The application for the amendment to the Supplemental Type Certificate was made by W. H. Conrad, who was President of Airline Training, Inc., Ft. Lauderdale, Florida. Conrad was informed by Faller that additional data would be required after December 18, 1963. The projected modification was approved as of January 10, 1964, the Supplemental Type Certificate was not actually signed until January 27, 1964 but not delivered until February 25, 1964. Prototype tests were made on a model of the two planes owned and operated by South Central before a manual was issued. The Supplemental Type Certificate was signed February 25, 1964, but bore the date of January 10, 1964.

Nels E. Nelson, a U. S. certificated mechanic, who worked for Airline Training, Inc., certified on January 25, 1964 that the alterations and attachments to N2999 were made in accordance with the requirements of Part 18 of the U. S. Civil Air Regulations.

Ben H. Brauchler, also a U. S. certificated mechanic, certified on January 21, 1964 that the alterations and attachments on N2999 were made in accordance with the requirements of Part 18 of the U. S. Civil Air Regulations.

A detailed showing of the alterations and attachments was made on two sheets attached to the Certificate. Thus, Brauchler and Nelson, certified mechanics, neither of whom was employed by the Government, signed the Certificate restoring N2999 to service. Brauchler discussed the proposed modifications with Conrad on December 11, 1963, at which time Conrad made it known to him that he wanted to increase the efficiency of the airplane so as to fly it at an increased take-off gross weight of 9360 pounds.

It was the business of Conrad to take the data or information approved on Supplemental Type Certificates and manufacture kits and sell the kits to various people over the country. He made about 50 kits on the modification of Beechcraft D18 or N2999. Sheets attached to Form 337 issued by certified mechan-

ics to release a plane to service after repairs or modifications were made (Plaintiff's Exhibits 6, 9 and 10 show in detail all of the modifications that were made.

Plaintiff's Exhibit 2 shows the information furnished by Conrad to Faller of the FAA for the Supplemental Type Certificate. Conrad was to submit manufacturer's drawing and installation drawing and supply a flight manual. The change required a supplemental flight manual. Conrad submitted the flight manual which was approved by Faller on January 10, 1964. (Plaintiff's Exhibit 4.)

Conrad submitted flight test reports which met the minimum requirements of FAA, but Faller testified that Conrad illegally directed that the modifications be made on N2999 before the Supplemental Type Certificate was signed by the FAA representative on February 25, 1964. The Supplemental Type Certificate was held up after January 10, 1964 to February 25, 1964 because of a new requirement for a downspring.

 Beechcraft 9360 was described by Faller as the poor man's version of Beechcraft 10200. The 9360 configuration of the Beechcraft type airplane is in use today. The Beechcraft airplane is airworthy when it leaves the factory. If changes to it are made, a certificate must be obtained from the FAA. An airplane keeps its airworthiness certificate as long as it is kept in repair. It is the pilot's duty to see that the airplane is properly repaired. Beechcraft N2999 had not been inspected by the FAA as it had been owned by South Central only three days before the accident. The other airplanes owned by South Central were inspected by FAA on November 15 and November 22, 1963.

Charles M. Carrier, who was as the Supervising Inspector of FAA in Miami, did not see N2999 before the date of the crash, February 3, 1964, but he affixed his signature approving the data as shown on Form 337, Exhibit 9. By signing Form 337, Exhibit 9, he simply approved the data shown on the sheets attached thereto. It was Matthews, a non-Government employee, who signed the certificate for the airplane to return to service after Carrier had approved the data attached to Form 337.

John McWhorter, an attorney of Miami, Florida, who is now employed by the Peter J. McBain & Associates Company, which is an aviation adjusting service, formerly worked for the Civil Aeronautics Board. He was in charge of the investigation of the crash. He testified that there were no structural failures in N2999 and no evidence of malfunction prior to the crash. The landing gears were in a full upward position and flaps in a down position. The trim tabs were in a full up position and the nose was in a down position. Everything was done to the airplane that should have been done at the time of the crash, except that the downspring had not been installed, which was a minor matter.

Mr. McWhorter stated that with 170 pounds in each seat of the plane and with fuel and baggage loads, the center of gravity would go beyond 125 inches aft of the datum line which was beyond the center of gravity limitation. The airplane was tail heavy to start with and loaded with 170 pounds in each seat with the baggage and fuel load it had on the day of the crash, the airplane would not fly. Nothing was found in the ruins of the burned airplane from which anyone could determine the center of gravity of the airplane as loaded on the day of the accident. He was of the opinion that the airplane was not airworthy and that the FAA violated a duty to the passengers in permitting it to fly. He stated that the minimum flight requirements set forth in Sections 3.74 [2], 3.75 [3] and

---

2. "§ 3.74. *Maximum weight.* (a) The maximum weight shall not exceed any of the following:

"(1) The weight selected by the applicant.

"(2) The design weight for which the structure has been proven, except as provided in § 3.242 for multiengine airplanes.

"(3) The maximum weight at which compliance with all of the applicable

3.76 [4] of the Civil Air Regulations, promulgated by the Civil Aeronautics Board were violated. He was of the opinion that Sections 3.74, 3.75 and 3.76 would permit the airplane to carry passengers weighing 170 pounds each, plus maximum fuel requirements and maximum amount of baggage. He stated that if the airplane were loaded with passengers of 170 pounds each, with its maximum baggage and maximum fuel load, the total amount of the load would put the airplane out of balance; that the airplane could not use ten seats occupied, with baggage compartment load and fuel load, and fly. He stated that it was the duty of the pilot to figure the weight and balance on the airplane. Unless the airplane is loaded properly and balanced, it will not fly. N2999 was not loaded properly in that there was too much weight in the rear. More of the load should have been put in front. The airplane would not fly with the center of gravity more than 122 inches aft of the datum line. McWhorter stated that the pilot had no information by which he could have loaded the airplane correctly. He replied upon the information contained in Form 337. He did not have sufficient information to compute the weight and balance. He stated that the pilot could have computed the weight of the airplane from page 2 of Form 337 (Exhibit 9), but that he did not have Form 337 at the time of the crash. He stated that Thompson would not have flown the airplane if he had been in his right mind. He was of the opinion that Thompson knew that the airplane was overloaded. It was considerably out of balance and much overweight, in the opinion of McWhorter. If McWhorter had been the pilot, he would not have permitted two heavy men to sit in the rear seats. He would have put them in front.

McWhorter was of the opinion that the FAA violated Section 3.76 in not requiring flight manual with loading instructions to be in the airplane at the time of the crash. There is no positive testimony as to whether a flight manual was or was not in the airplane at the time of the crash. The only testimony on the subject was that a flight manual was not found in the airplane after the crash.

Thomas Dobbs, who has been an airplane pilot since 1937, was employed by South Central in 1963. He flew the N2999 airplane on February 2, 1964, or the day before the crash, from Ocala to Miami. All of the seats in the airplane were full, but three or four of the pas-

---

flight requirements has been demonstrated.

"(b) The maximum weight shall not be less than the weights under the loading conditions prescribed in subparagraphs (1) and (2) of this paragraph assuming that the weight of the occupant in each of the seats is 170 pounds for the normal category and 190 pounds for the utility and acrobatic categories, unless placarded otherwise.

"(1) All seats occupied, oil to full tank capacity, and at least a fuel supply for one-half hour operation at rated maximum continuous power.

"(2) Fuel and oil to full tank capacities, and minimum crew."

3. "§ 3.75. *Minimum weight.* The minimum weight shall not exceed the sum of the weights of the following:

"(a) The empty weight as defined by § 3.73.

"(b) The minimum crew necessary to operate the airplane (170 pounds for each crew member).

"(c) One gallon of usable fuel (see § 3.437) for every 12 maximum continuous horsepower for which the airplane is certificated.

"(d) Either 1 gallon of oil for each 25 gallons of fuel specified in (c) or 1 gallon of oil for each 75 maximum continuous horse power for which the airplane is certificated, whichever is greater."

4. "§ 3.76. *Center of gravity position.* If the center of gravity position under any possible loading condition between the maximum weight as specified in § 3.74 and the minimum weight as specified in § 3.75 lies beyond (a) the extremes selected by the applicant, or (b) the extremes for which the structure has been proven, or (c) the extremes for which compliance with all functional requirements were demonstrated, loading instructions shall be provided in the Airplane Flight Manual as specified in §§ 3.777–3.780."

sengers were children. He noticed that the airplane was tail heavy on that day and so advised Pilot Thompson. On the day of the crash, he flew another airplane from Ocala to Gainesville over the same route used by Captain Thompson. He developed a leak in his airplane and grounded it at Gainesville. The two passengers that he carried were transferred to Captain Thompson's airplane at Gainesville. He observed Captain Thompson taxi out to the end of the runway at Gainesville with flaps down. The next time he observed it, it was airborne. He didn't observe the take-off. Thompson was about 20 or 30 feet off the runway and the air flaps were down. The normal take-off is without flaps. The gear was in the down position and as he started to take-off the nose was lower. When the airplane had gotten about 100 feet in the air near the end of the runway, Dobbs saw the airplane pitch up and he said to himself, "Don't do that, you are going to crash with flaps down." When the flaps are down on a short take-off at low speed, it has a jarring effect. N2999 was airworthy when he flew it the day before from Ocala to Miami. It is the duty of the pilot to judge the airworthiness of the airplane he flies. Flying a Beechcraft airplane with flaps down makes it more difficult to control. It is the normal and safe practice to seat the heavy passengers in the front portion of the airplane.

Form 337 (Exhibit 9) is the basic form used in computing weights and balances and is used by South Central for that purpose. Each ticket office has Form 337. The center of gravity table (Exhibit 7) is a part of the handbook that is kept in the airplane. Exhibit 8, which contains moments according to the occupant's weight and seat number, is another chart that is kept in the airplane. These forms are used to compute weights and balances. Exhibit 9 gave the empty weight of the airplane. The pilot needed to know the weight of the passengers and the weight of the baggage. With this data, he could compute the weight and balance of the airplane.

He should always figure the weight and balance.

The question whether the baggage compartments were placarded was a disputed one. Dobbs did not remember whether compartments in the front and nose were placarded on November 3. The placards were of a permanent plastic nature.

Matthews stated that he placarded the rear compartment and that it stated in effect, don't exceed 300 pounds. If a person was in that compartment, the weight of the person was subtracted from the 300 pounds. A placard was not found in the investigation.

Faller, an airplane pilot of experience dating back to 1931, testified that the weight and balance of the airplane could be calculated from the information contained in Exhibits 6, 7, 8 and 9 by ascertaining the weight of the fuel, oil, number of passengers and weight, and the weight of the baggage. He also testified that he could have seated the nine passengers that were in the airplane at the time it crashed and put their baggage in the compartments so as to have stayed within the center of gravity limit of 119.1 and 120.12. When the airplane left the ground the center of gravity was 124.7 inches aft of the datum line and the pilot had .7 inch margin. It was over-weight approximately 40 pounds. It could have been flown safely according to Faller. It could have carried 10,200 pounds with the same engines. It was overloaded in the rear and this made it uncontrollable. The flaps being down forced the airplane into the air at a very low speed, which made it more difficult to control. The landing gear was retracted, and this shifted the center of gravity to 129 inches aft of the datum line.

Regulation 3.74 is used to determine the maximum weight of an airplane, and this regulation was complied with. Regulation 3.76 states that if an airplane can be loaded outside of the center of gravity range, means must be provided the pilot to arrange load within the gravity range. Regulation 3.76

doesn't require that each seat be occupied by a person weighing 170 pounds.

Thus, we have Brauchler and Nelson, two independent inspectors, who were not employed by the Government, approving the modification of the aircraft, and Carrier, an inspector employed by the FAA, who approved the data attached to Form 337, which he stated in effect complied with the minimum requirements for safety set by the FAA.

The preponderance of the evidence shows, and the Court finds, that the airplane was airworthy on the date of the crash. Any doubt that may have existed as to its airworthiness is removed by the fact that it was actually flown with a full load on the day preceding the accident.

The Federal Aviation Act of 1958 (49 U.S.C. §§ 1301–1542) makes it unlawful for any person to operate in air commerce any civil aircraft for which there is not in effect an airworthiness certificate.

The Administrator is charged with the duty to promote safety of flight of civil aircraft in air commerce by prescribing certain minimum standards governing the design and performance of aircraft and aircraft engines. (49 U.S.C. § 1421)

The Administrator is empowered to issue airman certificates specifying the capacity in which the holders thereof are authorized to serve as airmen in connection with the aircraft. (49 U.S.C. § 1422)

He is empowered to issue type certificates for aircraft, aircraft engines and propellers and to specify in regulations the appliances for which the issuance of type certificates is reasonably required in the interest of safety. (49 U.S.C. § 1423) A registered owner of any aircraft may file with the Administrator an application for airworthiness certificate for such aircraft. If the Administrator finds that the aircraft conforms to the type certificate therefor, and after inspection, that the aircraft is in condition for safe operation, he shall issue an airworthiness certificate. (49 U.S.C. § 1423(c))

The Administrator is empowered to issue air carrier operating certificates and to establish minimum safety standards for the operation of the air carrier to whom any such certificate is issued. (49 U.S.C. § 1424)

It is the duty of each air carrier to make inspection, maintenance and repair of all equipment used in air transportation as may be required by the rules and regulations of the Administrator. The Administrator shall employ inspectors who shall be charged with the duty of making such inspection of aircraft and appliances designed for use in air transportation, during manufacture and while used by an air carrier.

The Act established standards of care to be followed by the Administrator of the Federal Aviation Agency and his representatives in certificating air carriers to engage in air transportation. (49 U.S.C. § 1301)

The Supreme Court has made it clear that the distinction between the Government's negligence when it acts in a proprietary capacity and its negligence when it acts in a uniquely governmental capacity has been erased. Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48. On the other hand, the distinction between decisions made at the planning (or discretionary) level and those made on the operational level is generally accepted. At page 69, 76 S.Ct. at page 126, the Supreme Court said:

"The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or

give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act."

See also, United Air Lines v. Wiener, 335 F.2d 379, 394 (C.A. 9); United States v. Hunsucker, 314 F.2d 98, 103–104 (C.A. 9); Swanson v. United States, 229 F. Supp. 217, 219 (D.C.N.D.Cal.); Eastern Air Lines v. Union Trust Co., 95 U.S. App.D.C. 189, 221 F.2d 62.

As the Court said in Fair v. United States, 234 F.2d 288 (C.A. 5), the broad and just purpose of the Federal Tort Claims Act was

"'* * * to compensate victims of negligence in the conduct of governmental activities * * *' in circumstances 'like unto those in which private persons would be liable'; the courts will not be drawn into the 'non-governmental' versus 'governmental' dispute in determining liability; if the Government undertakes to perform certain acts or functions thus engendering reliance thereon, it must perform them with due care; that obligation of due care extends to the public and the individuals who compose it; the Government is liable for the actions of its employees dealing directly with the public in the application of established policies even if such employees are vested with a measure of discretion, and such liability of the Government for their acts and omissions in all of the respects mentioned is measured by the same rules as the local law applies to a private employer under like circumstances."

 Having decided to enter the broad field of the regulation of the flight and repair and modifications of aircraft and licensing of pilots, the Government becomes responsible for the care with which those activities are conducted. It may no longer take refuge behind the distinction between proprietary and governmental functions. But, the Government nevertheless does not become an insurer. Its liability is subject to the same requirements of negligence and causation as would affect the liability of a private person in the same circumstances. Mahoney v. United States, 220 F. Supp. 823, 826 (D.C.Tenn.)

Adverting for a moment to the three areas in which plaintiff claimed that the Federal Aviation Agency, as an arm of Government, was negligent, namely (1) its lack of care in certifying and licensing Homer Thompson, the pilot of the plane which crashed, (2) its negligence in approving, certifying and licensing South Central Airlines and (3) its negligence in approving and certifying the airworthiness of aircraft N2999 after its modifications and alterations, we have already noted that plaintiff appears to have abandoned its claim as to the licensing of Thompson.

As to the certification of the carrier and the airworthiness of aircraft N2999 as modified, the Court cannot say that it discharged its duty of care in either instance. It would seem to the Court that there was not proper coordination between the Charlotte and Florida offices of the FAA. And the Court is equally impressed that there was laxity in the manner in which the authorized inspector returned N2999 to service after its modification without checking the S.T.C. under which the modification was purported to have been made.

The difficulty the Court has is that, even though there appears to have been culpable negligence in these matters, it cannot find that either laxity caused the accident. Although there was conflicting testimony, the Court finds that the craft involved in the crash was airworthy and that there was data available to the pilot from which he could have determined its center of gravity.

 It does not consider that the laxities of which it has taken note were the proximate cause alone or in combination of the crash. The Court is of the opinion and finds that the error of the pilot in overloading the craft and positioning its load so that its center of gravity was moved rearwardly beyond

the safety point was the proximate cause of this tragic crash. See Bristow v. United States, 309 F.2d 465 (C.A. 6).

The proof fails to show any negligence upon the part of an agent, servant or employee of the Government while in the performance of his duties that was the proximate cause of the airplane crash on February 3, 1964, which resulted in the unfortunate death of plaintiff's intestate.

Present order in conformity with the view here expressed.