Jo C. DEAL, Executrix of the Estate of Philip L. Deal, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Mildred C. LETSCH, Administratrix of the Estate of Donna Colleen Letsch, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Gene W. BOWERMAN, Administrator of the Estate of Janet Gay Bowerman, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Gary R. HUNGATE, Administrator of the Estate of Mary S. Hungate, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Maxine S. HILL, Administratrix of the Estate of Janet Maxine Hill Mize, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Betty ROARK, Administratrix of the Estate of Shirley L. Roark, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Nos. F–72–C–42, F–73–C–5, F–73–C–7, F–73–C–8, F–73–C–11 and F–73–C–38.

United States District Court, W. D. Arkansas, Fayetteville Division.

April 16, 1976.

E. C. Gilbreath, Jones, Gilbreath & Jones, Fort Smith, Ark., for all the plaintiffs.

James W. Gallman, Fayetteville, Ark., for Jo Deal.

W. W. Bassett, Jr., Putman, Davis & Bassett, Fayetteville, Ark., for Letsch.

R. H. Mills, Springdale, Ark., for Bowerman.

R. H. Mills, Springdale, Ark., for Hungate.

Stanley W. Ludwig, Springdale, Ark., for Hill.

James Roy, Crouch, Blair, Cypert & Waters, Springdale, Ark., for Roark.

Michael J. Pangia, Trial Attorney, Aviation Unit, Dept. of Justice, Washington, D. C., Sam Hugh Park, Asst. U. S. Atty., Fort Smith, Ark., for the Government.

## MEMORANDUM OPINION

PAUL X WILLIAMS, Chief Judge.

These cases arise out of an airplane accident on March 6, 1971 in which six persons were killed.

The Federal Aviation Administration initiated a routine investigation and found no negligence on the part of its agents or the United States.

The legally appointed and qualified representative of the estate of each deceased filed a tort claim with the Federal Aviation Administration. The claims were denied or became stale and the present actions were filed against the United States. This Court has jurisdiction pursuant to 28 U.S.C. § 1346(b).

On March 6, 1976, Dr. Philip L. Deal and five of his employees were tragically killed in an airplane crash at Harrison, Arkansas. The accident was and is one of the saddest imaginable. Not only did a prosperous young doctor with great promise meet an untimely death, but also his wife and their three children were deprived of the love

and support which Dr. Deal had so generously provided. Dr. Deal's mother also suffered greatly, her loss being augmented when Mrs. Jo Deal, the widow, and the children moved to Dallas, Texas because there were too many constant reminders of Dr. Deal in the Fayetteville, Arkansas area.

Five young and talented ladies, some no more than children also lost their lives. Mary Hungate was a dental hygienist and Dr. Deal's assistant. She was twenty-seven years old, married to a devoted husband, who was then a student at the University of Arkansas and whom she partially supported. She was the mother of a four-month old baby son and of a three-year old daughter who had a special problem involving her motor control. Mrs. Hungate's death was and continues to be a tragic loss to her husband and children as well as to her parents. The grief on their part has been great and much above normal grief for loss of a loved one.

Janet Bowerman was only seventeen years old and a student at Fayetteville High School. She had always shown initiative in helping her family financially and was an affectionate daughter. She had decided to become a dental hygienist and through her job was gaining invaluable experience as well as accumulating savings to further her education.

Janet Maxine Mize was twenty-two. She was married and had attended Harding College and State College of Arkansas. Her future contained great promise.

Mrs. Shirley Lucille Roark was a graduate of the Career Academy Dental Assistant School. She was twenty-two and married. Like Maxine Mize, her prospect of a full and happy life ended suddenly.

Donna Colleen Letsch was seventeen and a student at Fayetteville High School. Her graduating class has established a scholarship fund in her memory. Her mother took Donna's death so hard that she required heavy sedation for several years and has still not fully recovered.

The Court finds that as to each of the deceased victims of this tragic accident, the survivors and next of kin have suffered more than the normal grief incident to the death of a loved one; that each deceased person possessed a unique talent for treating patients and had a bright and lucrative future awaiting him or her when life was so sadly and suddenly terminated.

Having described the magnitude of the tragedy as it relates to each of the decedents this Court chooses to approach the legal questions here presented from the point of view of the five passengers in the plane. As will be more fully explained hereafter, under Arkansas law the representatives of the passengers' estates are entitled to recover the full amount of damages they sustained if the United States can be found to have been negligent in any degree, whereas the government has raised the defense of comparative negligence as to claims of Dr. Deal's survivors. The defense against Dr. Deal's estate is based on the contention that Dr. Deal was apprised of the weather and yet chose to make the flight, knowing his plane did not have de-icing equipment and knowing that he had a paucity of experience in bad weather flying. *See McKee v. Granger,* Civil Aeronautics Board SE–699 (August 15, 1966).

■ 28 U.S.C. Sec. 1346(b) is in part as follows:

. . . the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, . . . for injury or . . . death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred.* (Emphasis added.)

This is contrary to the traditional conflicts of law rule that the law of the place of the harmful impact governs tort liability. *See Leflar, American Conflicts Law,* ch. 14 (1968). The discrepancy between the statutory language and the traditional rule was

resolved in *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), when the Supreme Court interpreted 28 U.S.C. § 1346(b) to require the forum to apply the entire law of the place of the act or omission including the law governing choice of law. In following the *Richards* "renvoi" approach, this Court must adhere to Tennessee conflicts law, since the plaintiffs allege negligence on the part of air traffic controllers who were at all times pertinent, located at Memphis, Tennessee.

■■■ Under Tennessee law, the law which governs actions for wrongful death is the law of the place of harmful impact. *Tune v. Louisville and Nashville Railroad Co.,* 223 F.Supp. 928 (M.D.Tenn.1963) citing *Parsons v. American Trust & Banking Co.,* 168 Tenn. 49, 73 S.W.2d 698 (1934). Here the accident occurred in Arkansas and therefore, Arkansas law governs the substantive rights of the parties.

■■■ Under the Arkansas comparative negligence statute in effect at the time of the accident (Acts of 1961, No. 61) a claimant may recover only if his negligence is of less degree than the negligence of the defendant. *Riddell v. Little,* 253 Ark. 686, 488 S.W.2d 34 (1972). If a claimant is without fault, he may recover the full amount of any damages proximately caused by the negligence of the United States and it makes no difference that some other claimant may have been more negligent than the United States. *See Scoville v. Missouri Pacific Railway Co.* 458 F.2d 639 (8th Cir. 1972). There is no contention that a passenger was in any way negligent. Therefore, under Arkansas law, the estate of each passenger will be allowed to recover if a controller was negligent in any degree if such negligence was a proximate cause of the accident and death. In other words, even if Dr. Deal is found to have been 99% at fault for the accident and a controller only 1% at fault, the passengers' estates are entitled to recover the full amount of their damages from the United States. The Court will apply these principles to the case at bar, bearing in mind that all that these personal representatives are required to

show is the slightest degree of negligence on the part of the controllers which proximately caused the accident.

Dr. Philip L. Deal was an orthodontist who resided in Fayetteville, Arkansas, and maintained offices in both Fayetteville and Harrison. To shorten his frequent trips to Harrison, Dr. Deal purchased a Beechcraft Bonanza airplane and learned to fly it.

On March 6, 1971, Dr. Deal was scheduled to see patients in Harrison. Though the weather was inclement, Dr. Deal arranged to meet his dental assistants, nurses and receptionists at Drake Air Field in Fayetteville. When Dr. Deal first arrived at the Airport and called about the weather he received the information which had been gathered at 7:00 a. m. Though the weather report permitted a noninstrument flight, Doctor Deal filed an instrument flight plan, but decided to wait until he received the 8 o'clock weather report.

The 8:00 report reflected a low degree of visibility, but still above the minimum required for visual flying. It also reported a cold front in the area and some precipitation. At 8:08 (1408:50 Greenwich Meridian Time) Dr. Deal obtained clearance from the Memphis Air Traffic Control Center to make an instrument flight from Drake Field in Fayetteville to the Boone County Airport at Harrison, Arkansas. The five assistants accompanied him.

The Federal Aviation Administration control system is a large and sophisticated system and getting larger and more sophisticated all the time. However, in this case, the Air Controllers at the Memphis, Tennessee Control Center had no actual visual or radar surveillance of the flight of the Deal plane from Fayetteville to Harrison, Arkansas. Its only contact was by radio. There is no contention that any act done or word spoken by a controller in Memphis was incorrect.

In order to more fully understand the manner in which the Federal Aviation Administration services the area between Harrison and Fayetteville and particularly, how it was afforded on the day of the accident,

we must explain some aspects of the existing air traffic control.

The lower altitude airspace in the Fayetteville-Harrison vicinity is known to air traffic controllers as the "Fayetteville Low" area. The nearest air traffic control center and the control center to which pilots in the Fayetteville Low area communicate is situated at Memphis, Tennessee. Within the control center at Memphis, each controller is assigned to work a specific geographical area, either as a radar or manual controller. A controller in a manual position keeps up with the location of aircraft in the area by radio contact with the pilots and flight plans which they have filed, whereas a controller manning the radar position is also qualified to locate aircraft through radar equipment. The controller who coordinates activity between the radar and manual operators is known as a Coordinator.

On the day of the accident Thomas Sammons held the manual position, Finney was on radar and the coordinator was Edmond F. Davis. The following communications between Deal and the Memphis control center are relevant to a discussion of the issues of this case. At 1408:52 Deal reported that he was headed north and leaving Drake Field, Fayetteville, Arkansas. At 1412:55 Deal reported that he was level at 5000.

At 1417:20 Deal reported that he was at 5000 feet and stated "we have some light rime ice, we would like to change to seven thousand." When Deal requested the change in altitude to seven thousand feet, Sammons was conferring with the Springdale flight service station and continued the interphone conversation, which began at 1416:26 and ended at 1417:37.

At 1417 Sammons, from the radar position, advised Deal that he was unable to give the requested altitude change to seven thousand because he had traffic westbound at six thousand and advised Deal that he could give him a lower altitude, which Deal accepted at 1417:53 and Deal descended to four thousand feet. At 1418:16 Sammons requested that Harrison Flight Service Station contact the westbound plane, hereafter called the Lima aircraft, and have the Lima

aircraft contact the Memphis Air Traffic Control Center. This was accomplished by the Harrison Flight Service Station, and at 1418:52 Lima contacted the Memphis Air Traffic Control Center and reported that he was at six thousand. Sammons made radar contact of the Lima aircraft through Harrison at 1419:28. Sammons made inquiry of Deal at 1421:22 to see if Deal was losing any of his ice, to which Deal responded in the negative at 1421:28. Sammons asked Deal at 1421:33 if he was requesting a higher altitude to which Deal responded emphatically in the affirmative at 1421:36. At 1421:43 Sammons directed the Lima aircraft to climb and maintain eight thousand and advised Deal at 1421:55 that he could climb and maintain six thousand, whereupon, Deal responded at 1422:00 that he was "out of four for six." At 1425:05 Deal advised Sammons that he was "out of five for seven, with heavy ice."

At 1428:39 Deal advised Sammons that he was coming up on six thousand, still getting the ice, but thought that the ice was beginning to break up a little. At 1428:45 Sammons made inquiry of Lima about his icing condition, to which Lima responded at 1428:49 "yeah, I'm ok at eight, uh, we're not picking up anymore."

At 1429:38 Deal advised Sammons that he was "no better on ice at six thousand, so we'll come on back down if you'll let us" to which Sammons responded at 1429:45:

"Seven seven zero eight Romeo, roger, and I'm painting a primary target, uh lost it that sweep, but, uh, about twelve miles southwest of Harrison, and, uh, you're cleared for an approach to the Harrison Airport, leaving four thousand."

At 1430:04 Deal advised Sammons that he was "out of six for four."

Deal then proceeded to the Boone County Airport, contacted the Harrison Flight Service Station, and made his approach to the Harrison Airport in accordance with the procedure as outlined in the approach plate for the Boone County airport.

Deal failed to make the final approach properly and instead of going around again,

elected to make a sharper turn than was usual. In doing this, he lowered the left wing so sharply it caused the plane to stall and crash. All aboard were killed.

The Plaintiffs contend that the Air Traffic Controllers were negligent in the following respects:

(1) in not acting more expeditiously at 1417:20 in giving Deal a higher altitude;

(2) in not hearing the transmission "with heavy ice" at 1425:05;

(3) in not considering Deal in an emergency situation and providing emergency assistance;

(4) in not realizing that Deal was in an emergency situation due to the several communications with reference to icing conditions;

(5) in not relaying the Lima pilot's report received at 1428:49 that Lima was not picking up any more ice at eight thousand feet;

(6) in that Davis was not actually in direct supervision of Sammons, a mere trainee in control of the Deal Flight and the radar assistance; and

(7) in not making interrogation of Deal as would have been required in an emergency situation.

■ In considering the various allegations of negligence, the Court notes that the duties and responsibilities of the controllers in respect to services to controlled aircraft are set out in the Enroute Air Traffic Control Manual promulgated by the Federal Aviation Administration. Plaintiffs must show that the controllers either breached one of their duties imposed by the manual or that the manual was inadequate to assure safe flight (*White v. Trans World Airlines, Inc.* 320 F.Supp. 655 (S.D.N.Y.1970)) and that such negligence was a proximate cause of the crash.

The primary duty imposed on air traffic controllers is to avoid collision. A.T.C. Manual, paragraph 25 p. 15 (1970). A controller may not give clearance for an aircraft to change its position when to do so would violate the separation standards imposed by the manual, although a pilot who deems himself in an emergency escapes penalty for violating the provisions of the Federal Aviation Regulations which prohibit a pilot from flying except at the altitude and on the course which the controllers have been notified he will follow. 14 C.F.R. Sec. 91.3(b). The Court finds that at 1417:20 Deal requested clearance to seven thousand feet. Twenty-four seconds later Sammons told Deal that there was a westbound plane in the vicinity flying at six thousand feet and therefore Deal could not immediately climb. Sammons voluntarily informed Deal that Deal could be granted clearance to a lower altitude. Immediately after speaking with Deal, Sammons attempted to get in contact with the westbound plane. The only method to accomplish this was to go through the Harrison Flight Service, which Sammons did. Sammons, then, as expeditiously as reasonably possible contacted Deal again to see if he still wanted a higher altitude and Deal responded that he wished to climb. Again acting as expeditiously as reasonably possible, Sammons notified the westbound plane and granted Deal clearance for a higher altitude.

■ The Court finds there was no negligence on the part of Sammons in not granting Deal clearance to a higher altitude any sooner. Sammons acted as quickly as he reasonably could. Even if there had been more than one controller attempting to accomplish the clearance, the contact with the westbound plane could not have occurred more quickly and Deal could not have been told of the clearance sooner.

■ Neither was Sammons negligent in not requesting the westbound plane to climb when he first initiated contact. There is no way of predicting whether a plane will encounter ice at a certain altitude. Because Sammons could not have known if the Lima plane would find icing conditions at a higher altitude, he exercised reasonable prudence in not ordering the Lima plane to climb until he was sure that Deal was still requesting a higher altitude.

Next the plaintiffs allege that the controllers were negligent in not hearing Deal's 1425:05 transmission in which he said that he was leaving five thousand feet "with heavy ice." As will become apparent this contention can only lead to liability if it is read in conjunction with the contentions concerning emergency situations. The plaintiffs contend that the controllers are charged with having heard the transmission, being estopped from denying that they heard the transmission because Sammons responded "Roger", a response which indicated receipt of the transmission. They allege that heavy icing conditions are treated as an emergency situation by the controllers and that if the air traffic controllers treated Deal as being in an emergency, the controllers would have somehow been of greater assistance to him. The problem with plaintiffs argument is glaringly apparent: neither they nor the Court can speculate on what the controllers could possibly have done if they had known an emergency existed, that they did not in fact do.

The plaintiffs contend that if an emergency exists or if there is a situation which the controllers should treat as an emergency, the controllers have a duty to ask the pilot of the distressed plane certain questions set out in the manual. A.T.C. manual paragraph 665, p. 129. The plaintiffs contend that failure to ask the enumerated questions constituted a breach of duty which was a proximate cause of the accident.

■ The Court finds that there was no duty on the part of Sammons to ask the questions. The questions concerned the location of the plane, the number of persons and the amount of gasoline on board. Deal had filed his instrument flight plan with the air traffic control in Memphis. His flight plan contained all of the information which Deal would have given Sammons, had Sammons initiated the questioning of Deal. In addition, Sammons testified that he had actual knowledge of Deal's location, the number of persons and the amount of gasoline on board. Sammons also testified that there was nothing he could do had he initiated the questioning and received the response.

■ In emergency situations, controllers are to give the distressed planes priority to the extent consistent with the rules governing separation of aircraft and to give the pilot any assistance which he requests. A.T.C. manual paragraph 665, p. 129. Here Sammons gave Deal clearance as expeditiously as possible. In other words, Sammons gave Deal the exact assistance which he requested. No other duty is or should be imposed on controllers.

■ Even in an emergency situation, an air traffic controller having only the information possessed by the controller in this case, has no duty to suggest that the distressed pilot take a certain course of action.

The final decision either to attempt a landing or divert to another airport was in the hands of the pilot. This is quite properly so since he is in the best position to observe and judge the actual effect of the weather on the plane's landing approach. *Ingham v. Eastern Airlines, Inc.*, 373 F.2d 227, 237 (2nd Cir. 1967)

Having found that the controller satisfied the duty to give the requested assistance, the Court notes that the failure of Sammons to ask the enumerated questions in no way contributed to the tragic accident.

Plaintiffs' claim against the United States is based on a theory that "if" a controller had done something which he had no duty to do and "if" Dr. Deal as a pilot had seen fit to follow the "if" action, then speculatively he would have piloted his plane in some other way and maybe to some other place and maybe there would have been no accident. We find this theory too conjectural and speculative to be considered as a part of a proximate cause.

The plaintiffs also allege that the controllers were negligent because Sammons was manning the radar position for the Fayetteville low area when he was not qualified to do so. The rules governing the activities of controllers provide that a trainee may operate a radar position, but his communications and actions must be monitored by one who

is qualified. The plaintiffs have proved that at 1414 GMT, Finney went to coffee and Davis signed in as being in charge of the radar position, though Sammons actually communicated to Deal from the radar position. Davis and Sammons both failed to hear Deal's 1425:05 transmission in which he stated that he was accumulating heavy ice.

 The Court finds that Davis was monitoring Sammons, even though the tape which recorded what Davis heard at the time pertinent, has been destroyed. The Court must also note that even if Davis had not been monitoring Sammons, the omission was not a proximate cause of the accident. As has been previously explained, the failure to hear "with heavy ice" in no way contributed to the accident. It is clear that even though Sammons was a mere trainee for the purpose of reading radar, he did not err in his treatment of Deal. Any qualified, experienced controller manning the radar position would have done exactly as Sammons had done, that is, he would have given the assistance which a distressed pilot requested.

Plaintiffs' last contention concerns the controllers' failure to relay to Deal that the westbound plane had reported that it was not picking up ice at an altitude of eight thousand feet. The Court finds that the controllers had no absolute duty to provide this information to Deal and in this case its failure to do so was neither negligence nor a proximate cause of the accident.

Paragraph 42, p. 18 of the Manual provides:

You may relay any elements of weather information as received in a PEREP (pilot weather report) to other ATC facilities or aircraft without consulting the weather reporting station.

b) Relay pilot reported significant weather information to other aircraft concerned and to the appropriate center FSS (Flight Service Station) . . . as appropriate.

 The Court finds that Sammons had no duty to relay Lima's report to Deal

because Deal was not at the time an "aircraft concerned." When the Lima plane reported it was no longer picking up ice at eight thousand feet, it was some considerable distance to the west of Deal's plane. Since icing conditions occur in pockets and at different altitudes throughout a cold front, there was nothing to indicate that Deal would or would not find it clear at eight thousand feet. This factor distinguishes the case at bar from *Ingham v. Eastern Airlines, Inc.,* 373 F.2d 227 (1967) in which liability was imposed for the controllers' failure to relay significant weather changes at the airport at which the plane was to land. In *Ingham,* there was no question but that the plane would incur the worsened weather conditions and also the air traffic controller had personal knowledge of the worsened weather conditions. The evidence concerning icing conditions leads us to the conclusion that there was no positive assurance that Deal would have found clear weather at eight thousand feet.

 The Court also notes that the air controllers in Memphis did not have radar equipment which would monitor the lower altitudes in the Fayetteville Low area. The controllers had no means of determining the weather in Deal's vicinity except what had been communicated to them by persons in the area. There are no allegations that the controller failed to report any significant weather information to Deal, except the information which the controller had gleaned from the Lima plane. The Court finds that Sammons was exercising due care in deciding that the Lima report would be inapplicable to Deal who was a considerable distance away.

 Neither was Sammon's failure to relay the Lima's report a breach of the common law duty to use ordinary care. Deal was only a few minutes from Harrison. The cold front was moving into the area, and apparently the icing problem would only get worse as the morning progressed. In light of these factors, Sammons had no duty to relay the weather report from the Lima plane as there was

nothing to indicate that Deal was in a position similar to the Lima plane.

 A controller is also required to exercise his best judgment. Given the fact that Deal's communications did not indicate that he considered himself in an emergency situation and the fact that Deal was only a few miles from Harrison when Sammons received the Lima weather report, we find that Sammons did not breach the duty to exercise his best judgment in failing to convey the Lima report to Deal.

The plaintiffs have also failed to establish by a preponderance of the evidence that the failure to report the weather information was a proximate cause of the accident. In Arkansas an act or omission is a proximate cause of an occurrence *if it is a* cause which in a natural and continual sequence produces damage and without which the damages would not have occurred. *Hartsock v. Forsgren, Inc.* 236 Ark. 167, 365 S.W.2d 117 (1963).

This Court would have to engage in speculation and conjecture to find that Sammon's failure to relay the Lima weather report in any way contributed to the accident. There is no proof that Deal would have climbed to eight thousand feet if he had known Lima's report; and his proximity to Harrison indicates otherwise. There is no proof that Deal would have found clear air if he had climbed to the higher altitude. There is no proof that Deal would have accumulated less ice if he had climbed. The Court mentions this because, to land at Harrison, which Deal, as a pilot elected to do, Deal would still have to descend through the strata which had contained ice. Though there is evidence that the accumulated ice affected the plane's aeronautical traits, there is also credible evidence that the crash occurred solely because Dr. Deal miscalculated the approach onto the Harrison runway and banked too sharply, when he could have gone around again and made a proper approach. We note that no action of any air controller caused the ice condition and there is no contention to that effect. Ice on the wings of a plane probably requires more skill on the part of a pilot in order to pilot and land the plane, but ice is a weather condition, and in this case better known to the pilot than to anyone else.

It would be error for this court to engage in the speculation and conjecture necessary to establish that Sammons' good faith exercise of his best judgment was a proximate cause of a passenger's death.

The Court finds that the plaintiffs have been unable to meet the burden of proving any negligence of an air controller which was a proximate cause of the tragedy.

Having found no actionable negligence on the part of the Air traffic controllers, the Court finds that all of the claims including the Deal claim, against the United States should be dismissed. The Clerk will prepare an Order in accord with this opinion.