**INSURANCE COMPANY OF NORTH AMERICA, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. J–C–78–162.**

United States District Court, E. D. Arkansas, Jonesboro Division.

Dec. 9, 1981.

J. Nelson Happy, Happy, House & Cooling, P. C., Kansas City, Mo., Stephen M. Reasoner, Barrett, Wheatley, Smith & Deacon, Jonesboro, Ark., for plaintiff.

Richard M. Pence, Jr., Asst. U. S. Atty., E. D. Ark., Little Rock, Ark., Roy Maurer, Trial Atty., Litigation Div., Federal Aviation Administration, Washington, D. C., for defendant.

## MEMORANDUM OPINION

ROY, District Judge.

This action arises out of the crash of a twin-engine Beechcraft Baron aircraft, registration No. N9259Q [59Q], at approximately 10:45 a. m. Central Daylight Time [CDT], or 1545 Greenwich Mean Time [GMT], on May 17, 1975, in a plowed field approximately 5 miles west of Ripley, Tennessee. The aircraft was owned and operated by Gray Brothers, Inc., of Kansas City, Kansas. The pilot of the aircraft was Walter S. Gray, president of Gray Brothers, Inc. On board the aircraft with Mr. Gray were his wife and one of his daughters. The aircraft was destroyed and all the occupants were killed in the crash.

Mr. Gray was a private pilot with a single and multi-engine airplane rating and was also instrument rated. He had approximately 1,386 hours of flying time as a pilot.

The undisputed evidence establishes the fact that plaintiff Insurance Company of North America paid the sum of $80,000.00 to Gray Brothers, Inc., for the loss of the aircraft and plaintiff is now suing defendant United States of America for the full amount paid plus interest from the date of payment, and costs.

This action is brought pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. § 1346(b), 2671, et seq.[1]

The plaintiff's complaint alleges that the evidence in this case establishes that defendant's employees were negligent in numerous ways in the handling of Mr. Gray's flight; and, that as a result of this negligence, plaintiff sustained the loss of the sum paid to Gray Brothers, Inc., on its insurance policy. Plaintiff's contentions are as follows:

1. The air traffic controllers in Kansas City and Memphis improperly permitted Mr. Gray to file an area navigation flight plan at 5,000 feet, when the government's equipment was unable to maintain radar surveillance of the aircraft throughout the route. As a result of being assigned too low an altitude, Mr. Gray eventually experienced radio communication difficulty and weather problems which might not have otherwise been encountered by him. Kansas City Air Traffic Control improperly permitted Mr. Gray to stay on their frequency for too long a time, which resulted in communication problems between 59Q and Kansas City Air Traffic Control.

2. Due to lack of familiarity with assigned geographical airspace and altitude jurisdiction, air traffic controllers at Blytheville Approach Control, Memphis Approach Control, and Memphis Center engaged in a jurisdictional dispute as to which was responsible for controlling the Gray flight. As a result of this jurisdictional dispute, the controller of the Blytheville Approach Control improperly delayed Mr. Gray's flight by vectoring him on courses taking him outside of his regular flight path and failing to give proper instructions, as required by the Federal Aviation Administration (FAA) regulations. As a result of this action, the Gray aircraft was delayed, sent off course, and eventually directed into a thunderstorm.

3. The air traffic controller at the Blytheville Approach Control, upon being asked about thunderstorms in the area, negligently failed to inquire of the flight service station nearest the pilot's position and improperly advised the pilot that there were no thunderstorms in the area.

The first issue which the Court must determine is whether the substantive law of Tennessee or Arkansas should be applied in this cause. Thereafter the Court must determine whether the government controllers were negligent, and, if so, whether

1. This case was tried to the Court on May 5 and 6, 1981, but due to requests for preparation of the transcript by the attorneys and also for extensions of time to prepare briefs, the last brief was filed with the Court on November 23, 1981.

their negligent acts were the proximate cause of the tragic accident; and whether Mr. Gray was contributorily negligent and, if so, whether his negligence was of such extent as to bar recovery by the plaintiff insurance company.

An overview of the operational aspects of aviation as they relate to this case is necessary to an understanding of the facts of the accident as well as the regulatory environment within which aircraft are supposed to operate in compliance with the Federal Air Regulations (FAR).

All flying can be divided into two categories of operation: flights under the Visual Flight Rules [VFR], and flights conducted under the Instrument Flight Rules [IFR]. Flight under VFR is limited to what can be termed "fair weather flying" because the weather conditions necessary for such flying, while more fully set out in 14 C.F.R. § 91.105, essentially must allow the pilot to visually see the horizon and control his aircraft with reference to what he sees outside the window of his aircraft. Under VFR weather conditions, the pilot will control his aircraft much in the same manner that an automobile driver controls his automobile; i.e., he looks out his windows and visually determines the direction, altitude, and speed that he desires his aircraft to proceed. He is not required to fly any particular route nor even to file a flight plan with the FAA.

Under IFR, however, the pilot is expected to control his aircraft with regard to heading, course, altitude and airspeed by reference to his instrumentation inside the cockpit of the aircraft. IFR flight is possible, assuming the pilot is competent to conduct it, even when the weather conditions make it impractical or impossible to visually see outside the aircraft. The pilot is able to navigate solely by reference to radio navigation equipment installed in the aircraft, in the instant case by area navigation [RNAV], as he flies cross-country. Obviously, flight under IFR is more demanding on the pilot and requires a greater degree of skill and proficiency to accomplish it safely. In order to operate under IFR the pilot must have an instrument rating (14 C.F.R. § 61.65) which is current (14 C.F.R. § 61.57) and his aircraft must be equipped with the appropriate instruments and navigational equipment (14 C.F.R. § 91.33).

Because the pilot's outside visibility is obstructed in IFR conditions, he must be aided by air traffic control in maintaining separation from other aircraft. The air traffic control system exists primarily to provide separation between aircraft which are flying under IFR. The pilot is required to file a flight plan stating his intended destination and requested route of flight, and is then issued a clearance by air traffic control to proceed in a certain direction and at a certain altitude. During his flight, the pilot maintains his assigned heading or course and altitude as well as radio communications with air traffic controllers in various air traffic control facilities as he moves along his route of flight. The primary function of the controller is to provide the pilot with both lateral and vertical separation from other aircraft that are operating under IFR. In many cases, air traffic controllers will monitor the aircraft's progress by radar. Some types of radar installations can even provide the controller with a constant readout of the aircraft's altitude, provided the aircraft is equipped to transmit that information. Aircraft 59Q was so equipped as was Memphis Approach Control and Memphis Center on the day of the accident. Blytheville Approach Control was not so equipped. However, because of inherent limitations of radar, particularly at low altitudes, radar contact as well as line-of-sight radio contact cannot always be maintained.

The record herein reflects that on May 17, 1975, Walter S. Gray, the pilot of aircraft 59Q on the fatal flight, obtained a weather briefing, by telephone, from the Kansas City, Missouri, Flight Service Station for a flight from Kansas City, Kansas, to Birmingham, Alabama. After receiving the weather briefing the pilot filed an IFR flight plan for a direct route, RNAV flight to Birmingham.

The flight departed Fairfax Field, Kansas City, Kansas, at about 9:43 a. m. CDT (1443 GMT) and proceeded routinely under the air traffic control of Kansas City Center. Just prior to the hand-off from Kansas City Center to Memphis Center, and while the flight was presently over southeastern Missouri, the Kansas City Center was unable to contact the flight on the last assigned frequency.

Shortly thereafter Memphis Center established radio contact with the flight without incident and subsequently because the direct route filed by the pilot of aircraft 59Q took him through Blytheville AFB Approach Control airspace, Memphis Center coordinated a radar hand-off with Blytheville Approach Control and at 10:14 a. m. CDT (1514 GMT) advised 59Q to contact Blytheville Approach.

Aircraft 59Q did contact Blytheville Approach Control and had been passing through their airspace for approximately 15 minutes when the Blytheville Approach controller began trying to coordinate a radar hand-off with either Memphis Center or Memphis Approach Control. Both of these facilities were reluctant to accept the hand-off because each initially thought the aircraft would enter the other's airspace when it departed the Blytheville Approach airspace. This confusion arose because 59Q was projected to depart Blytheville's airspace very close to the borderline separating Memphis Center from Memphis Approach Control airspace, i.e., an altitude of 5,000 feet.

In order to retain the aircraft in its airspace until he could properly coordinate a radar hand-off, the Blytheville Air Force controller initially instructed the pilot of 59Q to make a left 360-degree turn. Subsequently, but prior to completing the 360-degree turn, the aircraft was instructed to roll-out on a heading of 270 degrees, in order to allow yet more time to coordinate the hand-off.[2] At approximately 10:35 a. m. CDT (1535 GMT) Blytheville Approach Control instructed 59Q to turn to a heading of 090 degrees, i.e., East, because Memphis Center had advised they had radar contact with the aircraft and had accepted the hand-off. The Blytheville controller then observed the aircraft turn and proceed eastbound. At approximately this same point in time Memphis Center radar identified 59Q at an altitude of 3,000 feet. At roughly 10:36 a. m. CDT (1536 GMT) Memphis Center advised that radar contact with 59Q was lost. Blytheville Approach Control continued to have radar coverage of the aircraft at that point and continued tracking it eastbound.

Although Blytheville and Memphis both had air traffic radar, Blytheville did not have altitude encoding capability at the time, so the controller actually controlling the aircraft and communicating with the pilot of 59Q did not have any direct means of ascertaining the altitude of the target he was tracking. By approximately 1539 GMT, Blytheville was no longer able to track the aircraft on their radar either. It may be surmised that 59Q had continued to descend until the aircraft was below the radar coverage of Blytheville AFB. Both Memphis Center and Blytheville Approach Control continued to attempt to contact 59Q by radio communications, but to no avail. No one ever reestablished radar or radio contact with the aircraft.

The next contact with the aircraft must have come very shortly thereafter when Mr. Thomas J. Haislip heard and observed the aircraft in the vicinity of Arp, Tennessee, schoolhouse flying just above treetop level and below the low overcast. The aircraft continued to fly in the local area "for some time" according to Mr. Haislip until he heard the sound of the impact which proved to be the fatal crash of 59Q.

Since there is sharp dispute as to the significance which the Court should attach to Mr. Haislip's deposition testimony, the

2. Testimony of several witnesses indicated that vectors are not unusual procedures, that the delay here was not excessive, and the pertinent Air Traffic Control Manual mandates a complete hand-off of the aircraft to another facility before allowing that aircraft to exit its airspace. The delay caused by the vectoring was only 4 or 5 minutes.

Court will discuss that matter at this time. Having read the entire deposition, the Court finds the testimony therein, to a large extent, to be incredible. Mr. Haislip was 68 years old and 4 years had elapsed since the date of the accident at the time he gave his deposition. In contrast to the simple statements that he made immediately following the accident, his deposition testimony apparently is based upon his imagination and certainly not upon reality as it was physically impossible for events to have occurred as he related them. The accident evidently happened approximately 10 minutes or so after contact with the aircraft was lost by the Blytheville Air Force controller.

To illustrate, Mr. Haislip testified that the interval between the first time he heard the airplane and the next, a second time he heard the airplane, was 20 minutes. The time interval between that second time and the third time when he saw and heard the airplane was 40 minutes. The time interval between that time and the next (fourth) was 30 minutes. He states the next time interval, between the fourth and fifth contact with the airplane was 10 to 15 minutes, and then between that time and the sound of impact was another 15 minutes. In summary, Mr. Haislip had Mr. Gray flying 59Q around the Ripley area for approximately 2 hours prior to the crash.

The Court also finds his testimony concerning thunderstorms and other matters greatly exaggerated.

■ As to the choice of law issue, in suits brought under the Federal Tort Claims Act it is the law of the place where the act or omission occurred that applies, including its choice of law principles. 28 U.S.C. § 1346(b); *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Loge v. United States*, 662 F.2d 1268, 8th CCA, 1981.

The FAA air traffic controllers were located in Kansas City, Missouri, and Memphis, Tennessee, when their allegedly negli-gent acts or omissions occurred. The Air Force's air traffic controllers were located at Blytheville AFB, Arkansas, when their allegedly negligent acts or omissions occurred.[3]

■ The Court must look to the entire law of both Arkansas and Tennessee in resolving the conflict of laws issue. Tennessee's conflicts rule in negligence cases is the doctrine of *lex loci*. *Winters v. Maxey*, 481 S.W.2d 755 (Tenn.1972). Therefore, since the crash occurred near Ripley, Tennessee, inside Tennessee, application of Tennessee's conflicts law establishes the substantive law of Tennessee as controlling in this case. See, for example, *Deal v. United States*, 413 F.Supp. 630 (W.D.Ark.), *aff'd.* 552 F.2d 255 (8th Cir.); *cert. denied*, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 175 (1976).

Arkansas, to the extent the rule was not modified by *Wallis v. Mrs. Smith's Pie Co.*, 261 Ark. 622, 550 S.W.2d 453 (Ark.S.Ct. (in banc) 1977), still follows the *lex loci* rule.

The *Wallis* decision is distinguishable from this case as it involved an action brought in Arkansas by Arkansas residents against a Pennsylvania corporation for injuries sustained in an automobile accident on a Missouri state highway while both parties were en route to destinations in other states. The court held that Arkansas' governmental interest in its citizens was best served by application of its comparative fault statute rather than Missouri's contributory negligence law. In reaching its decision in *Wallis*, the court pointed out that in an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship to the occurrence, in which event the local law of the other state will be applied.

In the instant case there is no party involved who is a citizen of either Arkansas or Tennessee. Even if the Arkansas signifi-

---

**3.** Since superseding events occurred after the negligence of the Kansas City controllers in furnishing Pilot Gray with directions and since neither party has urged that the substantive law of Missouri be applied here, the Court will not consider this forum.

cant contacts rule were to be applied here, there was no significant difference between the contacts in Arkansas and Tennessee except that the plane crashed in Tennessee. Therefore, the Court finds that the substantive law of Tennessee, the state where the accident occurred, is controlling.

■ In Tennessee, plaintiffs have the burden of proving a duty of care owed by the defendant to the plaintiff, breach of that duty, and that the breach was causally related to the injury complained of. *Shouse v. Otis*, 224 Tenn. 1, 448 S.W.2d 673 (1969).

■ Tennessee has a unique rule concerning negligence, i.e.:

"... that proximate contributory negligence bars recovery but remote contributory negligence only mitigates damages. The Court of Appeals for the Sixth Circuit has said that 'the distinction between proximate and remote contributory negligence is of a subtle if not gossamer quality, peculiarly suitable for determination by the trier of fact.' " [4]

Proximate contributory negligence on the part of the plaintiff bars recovery completely, *Perry v. Gulf, Mobile & Ohio R.R. Co.*, 502 F.2d 1144 (6th Cir. 1974). The court held that violation of a statute or municipal ordinance is negligence *per se* in Tennessee, *Alex v. Armstrong*, 215 Tenn. 276, 385 S.W.2d 110 (1964); *Berry v. Whitworth*, 576 S.W.2d 351 (Tenn.App.1978). Federal Aviation Regulations [FARs] have been held to have the force and effect of law. *United States v. Schultetus*, 277 F.2d 322 (5th Cir.), *cert. denied*, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960). Violation of these regulations has been held to be negligence as a matter of law. *Gatenby v. Altoona Aviation Corp.*, 407 F.2d 443 (3d Cir. 1968).

Plaintiff's pilot expert, Mr. George H. Rhodes, testified that the pilot violated the regulations pertaining to compliance with air traffic control clearances and instructions, i.e., maintenance of assigned altitude, but that Mr. Gray was exercising his emergency authority as the pilot-in-command and he had the right to violate those rules.

It was also his opinion that Mr. Gray made a "good controlled crash landing" indicating that Mr. Gray had not become disoriented or suffered an attack of vertigo.

Inspector Robert E. Harrison was the FAA employee who was sent to the scene of the accident to assist in the investigation by the National Transportation Safety Board [NTSB]. He is also an FAA pilot with impressive credentials and testified as the government's pilot expert. His opinion as to the cause of this accident was that the pilot of aircraft 59Q, Mr. Gray, failed to control his airplane while he was flying in instrument meteorological conditions in the clouds. Specifically, he failed to maintain his assigned altitude, ultimately allowing the aircraft to stall and crash into the ground. He described the stall and crash as a 5,000-pound mass sinking at a rate of 1,500 feet a minute until impacting the ground.

Mr. Lewis Wells, the NTSB accident investigator whose deposition was read at trial, described the crash as a "pancaking in" and that the wreckage pattern had the earmarks of a stall accident.

Dr. William R. Kirkham, an FAA pathologist, testified that the three persons on board the aircraft had various multiple fractures of multiple bones, very severe head injuries, including partial decapitation and avulsion of the skull, where most of the brain was spilled out, severe chest injuries, multiple fractures of ribs with probable compression of the chest to the extent that the heart actually burst in one victim, a tear in the major artery across the chest of the pilot, which in Dr. Kirkham's opinion indicated very severe impact on landing.

Defendant's Exhibits Nos. 19 and 20 consist of admissions of an employee of the plaintiff in the scope of his employment, Mr. E. C. Childers, aviation manager, that he believes the crash was caused by the pilot leaving his assigned altitude and ultimately stalling the aircraft, which caused the crash.

---

**4.** Woods, Comparative Fault—Appendix, p. 559.

In light of the above evidence the Court does not agree with the plaintiff's contention that this crash was a "good controlled crash landing."

It is impossible for anyone to know exactly what caused Pilot Gray to get off his course. No direct evidence can tell us what was happening in the plane or why the rapid descent from 5,000 feet took place. But from the testimony of the experts and the inferences which can logically be drawn therefrom, apparently Mr. Gray became confused and blindly descended through the clouds without knowing what was in front of him or below him. It would appear that he broke out of the clouds underneath an extremely low overcast, estimated to be only a couple of hundred feet above the ground with very little visibility available to him. He attempted to operate under this low overcast visually until he allowed the aircraft to stall and severely impact the ground, causing his death, the death of his family, and destroying the airplane that the plaintiff had insured. Under Tennessee law this negligence was a proximate cause of the accident and would have barred Mr. Gray's recovery.

The Court finds that Mr. Gray should have kept 59Q on its assigned altitude of 5,000 feet and awaited further instructions. In a brief period he would have been back on his way to Birmingham.

The air traffic controllers involved with 59Q had the right to assume that the pilot would conduct his flight operations pursuant to the applicable FARs and good operating practices.

While it is true that a section of the FARs allows a pilot who is involved in an *emergency requiring immediate action* to deviate from the rules to the *extent required to meet that emergency*, the proof did not reflect an emergency here which would excuse the conduct of Mr. Gray.

Mr. Gray never declared an emergency nor asked for any assistance from air traffic control after leaving his assigned altitude even though the means apparently were at hand for him to do so until 1536 by radio and until at least 1539 by radar transponder.

Mr. Robert B. Davison, plaintiff's air traffic expert, stated that radio failures are extremely rare. Inspector Harrison was unable to find any evidence of electrical or radio failure in his aircraft during his post-accident investigation. Likewise, he did not find any evidence of engine failure or in-flight fire in this aircraft. During cross-examination, Inspector Harrison went on to state that even if one engine had failed, this airplane could still have maintained 5,000 feet even through a thunderstorm. Inspector Harrison in response to cross-examination stated:

A. I don't know of any reason why he would assume that he was not able to maintain his altitude ... he should have been familiar enough with the airplane to know that it would still maintain 5000 feet even with an engine fail and in a thunderstorm. So I don't know of any reason why he would elect to descend.

Mr. Rhodes, one of plaintiff's witnesses, was asked:

Q. You wouldn't do that, would you? You would have stayed at 5000 feet, wouldn't you?

He answered:

A. ... I probably would have ... I don't panic.

■ The Court does not find such an emergency existed as would justify Mr. Gray's continued flying at the low altitude he maintained prior to the crash. Rather, from circumstantial evidence and expert testimony, the Court finds that Mr. Gray's operation of 59Q was negligent and reckless in violation of FAR. The Court also finds this negligence was not remote but was the proximate cause of the accident. The subrogated insurer is barred if the insured would be barred by his contributory negligence. *Couch on Insurance* 2d § 61.224, cases at f.n. 19; *Holt v. Myers*, 494 S.W.2d 430 (Mo.App.1973). The plaintiff's rights as against the defendant are derivative, the plaintiff having only such rights as it acquired from the insured. Further, the subrogee insurance company stands in the

shoes of its insured and is subject to the same defenses.

The primary responsibility for the safe operation of his aircraft is upon the pilot. 14 C.F.R. § 91.3; *Thingulstad v. United States*, 343 F.Supp. 551 (S.D.Ohio 1972). In addition to the FAR, a pilot is also required to abide by the provisions of the Airman's Information Manual and FAA Advisory Circulars. See *Thingulstad, supra; Crossman v. United States*, 378 F.Supp. 1312 (D.Ore.1974); *Blount Brothers Corp. v. State of Louisiana*, 333 F.Supp. 327 (E.D. La.1971). The air traffic controller has the right to rely on the assumption that the pilot knows and will abide by all the applicable regulations. See *Crossman, supra.*

The following Federal Aviation Regulations found in 14 C.F.R. are applicable to this case:

§ 91.3  Responsibility and authority of the pilot in command.

(a) The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.

(b) In an emergency requiring immediate action, the pilot in command may deviate from any rule of this subpart or of Subpart B to the extent required to meet that emergency.

§ 91.5  Preflight action.

Each pilot in command shall, before beginning a flight, familiarize himself with all available information concerning that flight. This information must include:

(a) For a flight under IFR or a flight not in the vicinity of an airport, weather reports and forecasts, fuel requirements, alternatives available if the planned flight cannot be completed, and any known traffic delays of which he has been advised by ATC.

§ 91.9  Careless or reckless operation.

No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

§ 91.75  Compliance with ATC clearances and instructions.

(a) When an ATC clearance has been obtained, no pilot in command may deviate from that clearance, except in an emergency, unless he obtains an amended clearance. However, except in positive controlled airspace, this paragraph does not prohibit him from cancelling an IFR flight plan if he is operating in VFR weather conditions.

(b) Except in an emergency, no person may, in an area in which air traffic control is exercised, operate an aircraft contrary to an ATC instruction.

§ 91.119  Minimum altitudes for IFR operations.

(a) Operation of aircraft at minimum altitudes. Except when necessary for take-off or landing, or unless otherwise authorized by the Administrator, no person may operate an aircraft under IFR below—

(1) The applicable minimum altitudes prescribed in Parts 95 and 97 of this chapter or

(2) If no applicable minimum altitude is prescribed in those parts—

(i) In the case of operations over an area designated as a mountainous area in Part 95 and altitude of 2,000 feet above the highest obstacle within a horizontal distance of five statute miles from the course to be flown; or

(ii) In any other case an altitude of 1,000 feet above the highest obstacle within a horizontal distance of five statute miles from the course to be flown.

The record reflects that 59Q was in radar contact 27 miles northwest of Blytheville at 1517 and remained so until 1539. The Court finds merit in the testimony of Mr. Joseph A. Beaudoin, air traffic control specialist assigned to the Evaluation Branch of the Accident-Incident Analysis Section of FAA, and in the government's position that the temporary lack of radar contact with the aircraft an hour before the accident or even a half-hour before the accident had no causal relationship to the accident. The purpose of paragraph 369(i) of the Air Traf-

fic Enroute Manual is to insure separation of air traffic. Paragraph 95 of the manual has to do with minimum distances between navigation facilities when radar service is not provided and is not relevant to this case because radar service was being provided the aircraft until shortly before the crash when Mr. Gray's altitude became too low for his plane to be contacted by radar service.

Even Mr. Davison, plaintiff's air traffic expert, recognized that 59Q was receiving radar service from Blytheville for approximately 22 minutes before descending out of its range.

Mr. Davison also concedes that the reason radar contact was lost was because 59Q descended below its coverage. He was somewhat reluctant to admit that the same reasoning applied to the loss of radio contact, but he did concede that both radar and radio operate on a line-of-sight principle.

Although there was some fault on the part of the Kansas City controllers, it was the opinion of the government's witness, Mr. Beaudoin, that once 59Q was reestablished in radar contact by Blytheville Approach Control at 1517 the air traffic service provided to 59Q was in accordance with the pertinent manuals.

After radar contact was lost at 1539, the aircraft crashed 5 miles west of Ripley, Tennessee, at 1545. If 59Q had maintained the 5,000-foot altitude he was assigned, Controller Raymond A. Wacter testified that they would have been able to maintain and continue radar and radio contact with the aircraft in the area of Victor 11 and indeed out to a minimum of 50 miles from Blytheville.

It is also noted that 59Q was never actually off of its route because that route is 8 miles wide—4 miles of protected airspace on either side of the centerline of his route. Mr. Davison's testimony acknowledged that point "F" on defendant's Exhibit No. 23, the crash site, is practically on the centerline of 59Q's route of flight.

5. This applies to the actions of the controllers at Kansas City, Memphis Approach Control,

As to plaintiff's contention that the Blytheville Approach Control controller negligently failed to inquire of the flight service station nearest the pilot's position about thunderstorms and improperly advised the pilot that there were no thunderstorms in the area, the controller at Blytheville did better than call on someone else to look for thunderstorms in the area of 59Q's route of flight. He looked on his radar himself and his supervisor looked on his radar and no thunderstorms were indicated.

From this testimony, as well as that of the government's expert, Mr. Benny H. Terry, Supervisor, National Weather Service, Radar Unit, State of Arkansas, the Court finds the substantial credible evidence indicates there was rain but no thunderstorms in the area of the crash site.

Even assuming the negligence of the air traffic controllers in causing the delay, the negligence of the pilot was a superseding cause and relieved the United States of any liability.[5]

A superseding cause is defined in the Restatement (Second) of Torts § 440 (1965) as follows:

"A superseding cause is an act of a third person or other force by which its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.

.    .    .    .    .

"Comment (b) A superseding cause relieves the actor from liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm. Therefore, if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated, there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm."

Memphis Center, and Blytheville AFB.

At the heart of the superseding cause doctrine is the belief that even though the defendant may have been negligent, when there is a subsequent act by another party that is so extraordinary and unforeseeable, the defendant's negligence has no longer been the cause of the accident. In this case, assuming the air traffic controllers were negligent in failing to promptly coordinate the radar hand-off of 59Q, thereby causing the delay which in turn resulted in the vectoring of 59Q for coordination, that negligence was superseded by the negligence of the pilot in abandoning his assigned altitude of 5,000 feet.

Courts have often applied the doctrine of superseding negligence to aviation cases. In *Rowe v. United States*, 272 F.Supp. 462 (W.D.Pa.1964), the Court dealt with a non-instrument rated pilot intentionally descending into a solid overcast and thereby becoming disoriented and losing control of the aircraft. At page 471 the court said:

> "Even if it were found that any employee of the defendant was negligent, we think that the patent recklessness of the noninstrument rated "pilot superseded that negligence and would relieve the United States from liability for the deaths of Rowe and Smith. Restatement, Torts, §§ 440, 447. The intervening act of the unqualified pilot in deliberately descending into a solid overcast was not only reckless conduct, but may be regarded as so highly extraordinary as to become a superseding cause of the deaths of his passengers, Rowe and Smith. We do not think that any employees of defendant could reasonably have foreseen such conduct on the part of the pilot. Id. § 447, comment g; and see § 500. Cf. *Central Flying Service v. Crigger*, 215 Ark. 400, 221 S.W.2d 45, 48."

See also *Black v. United States*, 441 F.2d 741 (5th Cir. 1971), *cert. denied*, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971).

The Arkansas Supreme Court, in the case cited in the *Rowe* decision, has applied the doctrine of superseding cause to an aviation accident. In *Central Flying Service v. Crigger*, 215 Ark. 400, 221 S.W.2d 45 (1949), the court stated:

> "No reasonable person could have been required to foresee, on March 23rd when the plane was rented to him, that the next day Wilkerson would endanger his entire aviation career and lose even his student permit, by taking a passenger in the plane.

> . . . .

> "Applying the rules of causal connection and proximate cause to the case at bar, it follows that before the appellants could have been held liable, it was necessary for the appellees to show that the appellants could have reasonably foreseen that Wilkerson, while on his trip to Forrest City, would take a passenger in the plane in violation of the rules of the Civil Aeronautics Board. No such showing was made, nor does the inference arise as a matter of law."

The Court does not believe the air traffic controllers at Blytheville or Memphis could reasonably foresee that the pilot of 59Q would leave his altitude of 5,000 feet and crash because they delayed his flight to Birmingham by issuing radar vectors to keep him inside Blytheville's airspace until the coordination could be effected with Memphis Center or Memphis Approach Control, whichever would have been appropriate. That decision, to abandon his altitude and descend to the ground, whether intentional or inadvertent, constituted substantial negligence on the part of the pilot.

In the case of *In Re Air Crash Disaster at New Orleans (Moisant Field), Louisiana, on March 20, 1969*, 422 F.Supp. 1166 (W.D. Tenn.1975), *aff'd*, 544 F.2d 270 (6th Cir. 1976), Judge McRae dealt with the somewhat similar problem of an aircraft descending below the minimum altitude allowed on an instrument approach. The court said at page 1178:

> "This Court finds in the instant case that the acts and words of the controllers in no way reasonably and probably caused the pilot to take the negligent actions which he did in attempting to land N142D.

"The patent recklessness of the pilot and crew of N142D superseded the negligence of the United States, which was not proximate."

Even assuming that the air traffic controllers were in some way negligent, it was the negligent conduct on the part of the pilot in abandoning his assigned altitude that was the superseding cause.

The plaintiff strongly contends that the substantive law of Arkansas should govern this case. Even if we assume *arguendo* that Arkansas law is applicable and that the controllers were to some extent negligent in their actions, the insurance company still could not prevail herein. In Arkansas, tort claims such as this are controlled by the comparative fault statute. [Acts of Arkansas 367 (1975) (Ark.Stat. Annotated 27–1763)].[6] See, also, *Deal v. United States*, 413 F.Supp. 630 (1976), *aff'd*, 552 F.2d 255 (1977), *cert. denied*, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 175 (1977).

Under the Arkansas comparative fault statute a plaintiff cannot recover unless his negligence (fault) is of less degree than the total negligence of the parties from whom he seeks recovery. In this case the Court finds that the negligence of Pilot Gray exceeds the total negligence of all the government controllers involved herein. The Arkansas law is the same as the Tennessee law cited *supra* in that a subrogated insurer is barred if the insured would be barred from pursuing his cause of action because of his contributory negligence. *Hartford Insurance Group v. Carter*, 251 Ark. 680, 473 S.W.2d 918.

Accordingly, plaintiff's complaint is dismissed with prejudice.

---

**6.** For a full discussion see Woods, comparative Fault—Appendix p. 427, *et seq.*