**Frances J. ROLAND, Individually and as Administratrix of the Estate of Thomas A. Roland, Deceased,**

v.

**UNITED STATES of America.**

No. IP 75–320–C.

United States District Court,
S. D. Indiana,
Indianapolis Division.

Dec. 5, 1978.

John A. Young, and Thomas P. Ledgerwood of Rocap, Rocap, Reese & Young, and

---

Bruce M. Pennamped, Indianapolis, Ind., for plaintiff.

Herbert L. Lyons and Cecile Hatfield, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OF OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NOLAND, District Judge.

### MEMORANDUM OPINION

This cause was commenced on May 30, 1975, seeking damages for the wrongful death of Thomas A. Roland resulting from the crash of an airplane in which he was a passenger. The Government answered the complaint by denying its agents were in any way negligent and by denying that any acts of its agents caused the crash. The case is before the Court pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* following the denial of plaintiff's claim by the Department of Transportation, Federal Aviation Administration.

28 U.S.C. § 2672 provides that the United States shall be liable

> [F]or injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred . . . .

This statute dictates that the law of Illinois controls in this action in that all of the acts of negligence outlined by the plaintiff in her post-trial brief relate to actions by agents of the federal government working at Meigs Control Tower in Chicago, Illinois. Any issues of law which arise must therefore be resolved according to Illinois law.

In Illinois, as in most states, the plaintiff must allege and prove that a breach of duty owed to the plaintiff has occurred causing an injury which is the proximate result of the breach. *Town of Thornton v. Winter-*

*hoff*, 406 Ill. 113, 92 N.E.2d 163 (1950); IPI 2d 21.02. The plaintiff, in her post-trial brief, has outlined several specific allegations of negligence, however, before reviewing these allegations in the Findings of Fact, some general observations in regard to airplane mishaps must be made.

The Court has received from the plaintiff a copy of the decision of Senior District Judge Oren Harris in *Martin v. United States*, 448 F.Supp. 855 (1977) involving issues similar to those now before this Court. Having reviewed that opinion thoroughly, the Court finds it clearly distinguishable on its facts from this action. In *Martin*, the aircraft was within the control zone of the Pine Bluff airport; the pilot was given a clearly inaccurate altimeter reading which caused him to approach the runway too low and strike the tops of trees in his path; and with knowledge that a special weather advisory was about to be issued the controller cleared the aircraft for a second landing attempt without advising the pilot of the upcoming advisory. In light of these facts, none of which are present in this action, The Court finds little support for the plaintiff's position in *Martin*.

The plaintiff has introduced into evidence many rules and regulations relative to the duties of air traffic controllers such as the one at Meigs Tower. The plaintiff asserts that deviation from these regulations constitutes negligence. The Court does not believe this is the law. In *Delta Air Lines, Inc. v. United States*, 561 F.2d 381, 389 (1st Cir. 1977) the Court states:

> While failure to conform to every mandatory Manual procedure, however trivial the deviation, would not necessarily constitute negligence . . . nonetheless a substantial and unjustified failure to follow procedures made mandatory by the Manual is persuasive as an indication of a lack of due care.

The Court clearly distinguishes between trivial, insubstantial deviation and failure to follow rules which are critical in all instances. This distinction is similarly found in other airline crash cases. *Ingham v. Eastern Airlines, Inc.*, 373 F.2d 227, 234

(2nd Cir. 1967). In *Gill v. United States*, 429 F.2d 1072 (5th Cir. 1970) the Court held not that the regulations create an absolute standard of care but rather that they indicate an assumption of responsibility by the government which places upon it a duty to exercise due care, however that is defined. In light of this precedent the Court may not find liability solely based upon deviations from the controller's regulations, but rather must analyze the circumstances of that deviation in order to determine its significance.

■ The second issue of law which requires attention is the relationship between the pilot and the air traffic controller. There is no doubt the pilot and the controller have a concurrent duty to accomplish a safe flight, however, their individual duties differ. It cannot be said that because each is concurrently responsible for the flight that the failure of one is a failure of both so as to place liability upon both. *Delta* discusses in detail the duties placed upon each member of this "team" to determine whether either or both violated their individual and distinct duties. It is not enough to say the pilot and the controller are concurrently responsible, they must also be concurrently liable, and one does not necessarily follow from the other even if both are found negligent. The Court will not concern itself here with the acts of the pilot but will rather determine whether the controller failed in his duty and whether that failure caused the death of Thomas Roland.

■ Finally, plaintiff quite rightly asserts that no negligence of the pilot may be imputed to the passenger for whose death recovery is here sought. In Illinois the general rule is:

> Where a person is guilty of the negligence charged against him, it is no defense that some other person, or thing contributed to bring about the results for which damages are claimed. *Romine v. City of Watseka*, 341 Ill.App. 370, 377, 91 N.E.2d 76, 79 (2nd Dist.1950).

The exception arises where the negligence of the third party is the sole proximate cause of the injury. *Id.* Here it is true that any negligence on the part of the pilot cannot be imputed to the deceased in order to relieve the government of any liability it may have; however, if such negligence on the part of the pilot was the sole proximate cause of the crash the government cannot be held liable even though its agent was in fact negligent. *Delta, supra.* Here the question of cause, as is true in most airplane crash cases, is difficult to determine with certainty. Though the pilot survived the accident he remembers nothing that occurred during the critical phase of the flight. Though he had talked with the controller at Meigs about weather conditions he was not at the time of the crash within the control zone of Meigs Field. The Court must, therefore, determine what information the pilot received and how a reasonable pilot would react thereto. This Court may hold the Government is liable for the death of Thomas Roland only if it is clear that the controller's advisories would mislead a reasonable pilot into taking action he would not otherwise have taken.

It is important to note that the United States is not an insurer of safe flights. *Gibbs v. United States*, 251 F.Supp. 391 (E.D.Tenn.1965). Though the government has undertaken the duty to provide assistance, the pilot has the primary responsibility for the operation of his aircraft and the safety of its occupants. 14 C.F.R. 913(a). The Court will review the acts of the controller in detail in the findings of fact to determine whether he was negligent as is required for the government to incur liability, however, this determination must be made in light of certain important events resulting from the pilot's conduct.

The pilot as a result of the crash, was charged with, and accepted without complaint or protest, his violation of seven Federal Aviation Regulations. He landed at the airport in Gary, Indiana, before proceeding to Meigs despite advice from the controller at Gary that weather conditions were too severe to assure a safe landing. Finally the crash sight in Lake Michigan was unquestionably in a fog bank which the pilot voluntarily entered despite the limita-

tion of his license to VFR. Taking into account that this accident occurred outside of the Meigs control zone it is necessary to consider the controller's actions in light of the reckless propensity of the pilot.

## FINDINGS OF FACT

### Background

1. The plaintiff, Frances J. Roland, is the duly appointed and qualified Administratrix of the estate of Thomas A. Roland, deceased, under letters of administration issued by the Marion County Probate Court on January 20, 1975.

2. The United States Government through the Department of Transportation, Federal Aviation Administration, has undertaken the task of providing air traffic control services, in all its particulars, at Meigs Field which is located on the shoreline of Lake Michigan at approximately 14th Street in Chicago, Illinois. Joseph Yokley was the FAA Controller and weather observer at Meigs Field at all times pertinent herein.

3. At approximately 6:19 A.M. local time on October 24, 1974, Thomas A. Roland departed Indianapolis Metropolitan Airport as a passenger aboard a Cessna 337 D twin engine Skymaster bearing FAA Registration No. N2HN. The pilot of this craft was restricted to and had filed a flight plan under visual flight rules (VFR). The plane was headed for Meigs Field in the hire of the American Fletcher National Bank for whom the pilot was to deliver checks to Chicago banks and for whom Thomas Roland was employed on other business.

4. The tower at Meigs Field records all radio transmissions with other facilities from each of its three control positions. The recording prepared at the Local Control Position shows that N2HN contacted Meigs Control at 7:07 A.M. local time to request its current weather conditions. Yokley replied, "Measured three hundred overcast, visibility seven miles." The pilot acknowledged this report and indicated he would contact the tower again upon reaching the hotels. The hotels are located approximately four miles south of Meigs Tower outside its control zone. They are often used as a reporting point for aircraft seeking clearance to enter the control zone.

5. The local control position recording further shows that N2HN requested current weather information at 7:31 A.M. while in the vicinity of the Gary Steel Mills which are approximately eight miles south of Meigs. At that time Yokley sent the following message:

Two Hotel November, Meigs weather is measured three hundred overcast, visibility four miles, fog, haze and smoke, report holding VFR clear of Meigs Control Zone, four miles south vicinity of the hotels for a special VFR clearance into the control zone, landing runway three six, wind zero three zero degrees at three, altimeter three zero two six.

6. The local control position recording further shows that N2HN reported hitting the water at 7:35 A.M. An oil slick was later spotted at approximately 7900 South which is over eight miles from Meigs Field and five miles outside of its control zone. A rescue helicopter was dispatched which, at 7:41 A.M., reported it had run into a solid bank of fog. The pilot of this rescue helicopter later stated in his deposition that he landed at approximately 50th Street because of the heavy fog.

7. Yokley recognized the voice of the pilot of N2HN and knew he had landed at Meigs on many previous occasions. In fact, the pilot testified in his deposition that he had flown the route he flew that day on many previous occasions and was very familiar with the conditions at Meigs. One of the aspects of operations at Meigs is the "lake front effect" which causes fog conditions to arise quickly. Because Meigs is a VFR field this lake front effect is a significant factor in Meigs' operations.

### Weather Observations

8. The plaintiff asserts that Yokley did not follow proper procedures in determining prevailing visibility on the day of the crash, did not familiarize himself with all relevant weather information, did not take the spe-

cial weather readings required when visibility falls below four miles, and failed to solicit pilot reports from other planes in the area.

9. Yokley testified that he followed the procedures outlined by the FAA manual when he determined the prevailing visibility. That process at Meigs is complicated by the lack of fixed points to the East in Lake Michigan which can aid in the determination of visibility in that direction. Also because there are no eight mile landmarks to the West an estimation of visibility must be made based upon the clarity of known landmarks nearer to the tower. The Court does not find Yokley's testimony at trial to be inconsistent with his deposition testimony in light of the ambiguity of the question asked by plaintiff's counsel at that deposition. In any event, the deposition question in dispute related only to the initial determination of eight miles visibility which was altered upon further observation before any report was made to N2HN. Nothing in his deposition conflicts with Yokley's statement that he took readings properly before reporting to that aircraft.

10. Yokley stated that there were no official sources of weather information other than his own observations and the Flight Service Station information. He testified that he received information from the Flight Service Station when significant information was available. He did not call them because the procedure was for them to call him for his observations and to inform him of significant conditions which may affect his area. He only called Flight Service if a special change in his own weather observations occurred. He did this at 7:12 A.M. to report a decreasing ceiling. Though a weather advisory had been issued for that day which included Meigs' area, it was not given to Yokley, apparently because his own current conditions were more severe than those outlined by the advisory. Even if he had received the advisory no information therein would have affected the reports he passed to N2HN.

11. At the time of the crash and within 12 minutes thereafter the Surface Weather Observations Log shows visibility of four miles. Seventeen minutes later visibility is shown as zero. The plaintiff's expert witness testified that once visibility falls below four miles special readings must be made as visibility drops. Here those readings were not made. All of this is irrelevant, however, since it occurred after N2HN had already hit the water. There is no need to consider whether this failure was negligence on the part of Yokley since it could have had no effect on the crash.

12. The plaintiff asserts that Yokley failed to solicit pilot reports (PIREPS) from planes in the area as required by the manual. PIREPS could have been sought from four aircraft in the Meigs area prior to the crash, however, the opportunity closest to the time N2HN was entering the Meigs area was more than twenty minutes earlier. At that time visibility was seven miles. In light of its deterioration to four miles at the time of the crash any information received would likely have been of little value and perhaps misleading. Further, Yokley testified none of these aircraft were in the southern part of his control zone, the area through which N2HN would pass. This testimony was confirmed by the Government's expert witness. The plaintiff's expert generally agreed with the direction of these flights though he felt they might still have provided useful information. The Court finds actual air traffic control experience in a control tower to be of critical value on this point.

13. The Court finds no act or omission on the part of the defendant's agents in regard to taking weather observations which constitute negligence proximately causing the crash of N2HN.

*Weather Information*

14. Even if the observation procedure followed by Yokley was proper the question remains whether the information thereby acquired and provided to N2HN was accurate. The plaintiff asserts that the information given has been shown to be inaccurate by three contrasting observations taken at the Dunne Crib, at 47th Street, and at the scene of the crash.

15. The Dunne Crib is a facility of the City of Chicago used to draw water from Lake Michigan into the City's water supply. Thomas J. Ward, who is in charge of these water intake cribs, testified that no ceiling observations are made at these cribs though visibility, temperature, wind direction and other readings are made for the aid of the National Weather Service. There was also testimony that these readings are essentially for the benefit of maritime interests. The Marine Coastal Weather Log for the Dunne Crib clearly indicates no ceiling information is taken. It does show zero visibility indicating at least ground fog conditions existed in that area on the day of the crash. These conditions would not necessarily conflict with Yokley's weather observations. No testimony was given in regard to the height of the crib. Yokley stated on cross-examination that the fog over the lake may be a low layer obscuring the crib but not otherwise affecting visibility. The Court finds nothing inconsistent here with the weather information given to N2HN.

16. Six minutes after N2HN hit the water a fire department rescue helicopter reported he was in solid fog at approximately 47th Street, which is south of Meigs and north of the hotels used by Yokley as a four mile visibility point. The pilot testified that he was surprised to run into the fog because the weather looked good when he took off, though he could not remember whether or not he could see the hotels. He was flying at about 100 feet and had to land to determine his location. There is no evidence in the record in regard to the height of the hotels. Again, as with the crib, this fog, of which the pilot of N2HN had been warned at 7:31, may have been close to the ground without obscuring the hotels from Yokley's view. If any part of those structures are visible, visibility is given as four miles. Further, the lake front effect previously noted is a shifting condition of fog over the water which may encroach on the land and retreat suddenly. Under these circumstances more than a single observation at a given point in time would be needed to discredit Yokley's observations. The Court finds nothing here in-

consistent with the weather information given to N2HN.

17. The plaintiff asserts the pilot encountered a solid bank of fog at the point of impact of which he had not been forewarned. The plane crashed eight miles south of Meigs. The information which an air traffic controller provides to a pilot is the local weather he has observed at his facility and any special conditions of which he is aware. The pilot indicated in his deposition that he knew he was not yet within four miles of the tower. Since visibility was reported as four miles at the tower, the pilot could not have been relying upon that weather report to show conditions at his present location. Further, the information he was given included the presence of fog. Having flown this route on numerous previous occasions, he was well aware of the lake front effect and the possibility of fog in the area of the crash. In any event his observation of fog eight miles from Meigs Tower in no way discredits the reports given by Yokley. The Court finds nothing here inconsistent with the weather information given to N2HN.

18. The Court finds no act or omission on the part of the defendant's agents in regard to the weather information provided to N2HN which constitute negligence proximately causing the crash.

*Flight Advisories*

19. The plaintiff asserts that the pilot of N2HN was given instructions which he could not lawfully execute, encouragement to make a landing he could not lawfully make, and no alternatives to the landing, all in violation of Yokley's duties as an air traffic controller.

20. The information given to N2HN at 7:31 A.M. as quoted above was interpreted by defendant's expert pilot Richard Taylor. He found this communication from Yokley required the pilot to remain VFR free of the clouds and to report again upon reaching the vicinity of the hotels to determine whether a special VFR clearance was appropriate before entering the control zone

858

of Meigs Tower. The plaintiff asserts the pilot was instructed to remain at 1000 feet above the hotels which Yokley knew he could not do since the ceiling was only 300 feet. Because the jargon of the air waves is not always clear to laymen, it is of critical importance that the words used by Yokley be interpreted for the Court by one in a position to understand their meaning. Taylor, as the only expert pilot to testify, has shown the plaintiff's interpretation is erroneous. If N2HN crashed in a solid bank of fog it was due to the pilot's failure to follow Yokley's request to remain VFR. The pilot is the only one who can judge the weather directly in front of him and avoid those conditions which present a hazard to him.

21. Plaintiff admits that no special VFR clearance was given to N2HN but claims error in suggesting one would be given. A special VFR clearance allows a pilot to enter a control zone even though the weather in that zone is less than VFR conditions. There are certain minimum conditions which must exist before a special can be granted, however, if these minimum conditions exist and there are no other aircraft in the control zone the air traffic controller must grant the clearance. Since the statutory minimums existed at the Tower in this case Yokley could have given N2HN a special VFR into the control zone and eventually cleared him to land. It would appear in fact that he was obligated to do so. Again the Court gives greater credence to the actual tower experience of the defendant's expert witness than to the knowledge of the plaintiff's expert.

22. The plaintiff asserts that Yokley should have discouraged the pilot of N2HN from his anticipated landing and suggested alternative courses of action. The Court finds no justification for this claim. To the air traffic controller there appeared to be no reason to abort the planned landing at Meigs. The minima for a special VFR existed and he knew of no impediments to N2HN's approach. It is for the pilot to remain in VFR conditions and to inform the air traffic controller when he can no longer do so. At that point alternatives may be suggested to accomplish a safe landing, but until such alternatives are required by known existing conditions no error can be found in their omission.

23. The Court finds no act or omission on the part of the defendant's agents in regard to the flight advisories given to N2HN which constitutes negligence proximately causing the crash.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this cause pursuant to Title 28 U.S.C. §§ 1346(b) and 2671, *et seq.*

2. Illinois law controls all issues of law in this action.

3. The plaintiff must show a duty owed to her decedent which was breached proximately causing her injury. *Town of Thornton v. Winterhoff*, 406 Ill. 113, 92 N.E.2d 163 (1950); IPI 2d 21.02 (1971).

4. The negligent act or omission must be the cause which produces the injury, but it need not be the sole cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which, in combination with it, causes the injury. *James v. Checker Taxi Co.*, 22 Ill.App.2d 22, 159 N.E.2d 12 (1959); IPI 2d 1501 (1971).

5. The United States has undertaken an obligation and owes a duty to provide flight and weather service to aircraft such as the one on which plaintiff's decedent was a passenger.

6. No breach of this duty on the part of any agent of the United States has been shown.

7. Though the actual cause has not been shown by the record before the Court, it has been shown that no act of any agent of the United States proximately caused or contributed to the death of Thomas A. Roland.

8. The facts and the law are with the defendant and against the plaintiff in this action.