Linda K. TINKLER; Jason P. Tinkler, a minor, by his parent and guardian Linda Tinkler; and James E. Tinkler, IV, a minor, by his parent and guardian, Linda Tinkler, Plaintiffs,

v.

UNITED STATES of America, acting by the FEDERAL AVIATION ADMINISTRATION, Defendant.

Civ. A. No. 86–2053–S.

United States District Court, D. Kansas.

Nov. 23, 1988.

Winton A. Winter, Jr., Scott J. Bloch, Stevens, Brand, Lungstrum, Golden & Winter, Lawrence, Kan., for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., Benjamin L. Burgess, Jr., U.S. Atty., Janice Miller Karlin, Asst. U.S. Atty., Kansas City, Kan., Patricia K. Gilmore, James Wilson, Trial Attys., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This case against the United States was brought under the Federal Torts Claim Act, 28 U.S.C. §§ 2671 *et seq.*, to recover damages for the death of James E. Tinkler, III ("Tinkler"), which was the consequence of an airplane crash. Plaintiffs allege that the actions and conduct of an agent of the United States constituted negligence which caused the plane crash. The crash, involving a Piper Comanche aircraft, with registration number N8852P ("N8852P"), occurred on April 25, 1985, near Wakeeney, Kansas.

This case was tried to the court from September 19, 1988 through September 28, 1988. After serious consideration and review of the evidence presented, the court is now prepared to rule on this case. The court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The April 25, 1985 crash of N8852P, near Wakeeney, Kansas, occurred at approximately 9:52 p.m. Central Standard Time ("CST") (0352 Greenwich Mean Time ("GMT")). The pilot, Larry Cunningham, and his passenger, James E. Tinkler, III, were killed in the crash. The plane, owned by Dodge City Farm and Industrial Oil, was destroyed.

2. James E. Tinkler was a commercial loan officer with Consolidated State Bank in Hill City, Kansas. He also operated a computer consulting business out of his home in Hill City, Kansas. On April 25, 1985, Mr. Tinkler was flown to Dodge City, Kansas in N8852P to consult with Mr. Cunningham about Cunningham's businesses. The pilot on the afternoon flight down from Hill City to Dodge City was Leigh Crotts.

3. Linda Tinkler, widow of James Tinkler, and her minor sons, Jason and James, brought this wrongful death suit against the United States. They seek damages for the alleged negligence of a flight service station specialist at the Dodge City airport.

4. At the time of the crash, Mr. Cunningham was flying Mr. Tinkler back to Hill City in N8852P. Mr. Cunningham was a pilot with over 5,000 hours of flight time. He held private pilot licenses for single engine and multi-engine aircraft, and also held a commercial pilot's license. Also, Mr. Cunningham was instrument rated, meaning he could fly properly equipped aircraft under instrument flight rules (navigating without ground references, *e.g.*, in clouds). Mr. Cunningham was an active and experienced pilot. Also, Mr. Cunningham was familiar with the area between Dodge City and Hill City. He had flown in the area before. Passenger James Tinkler had no pilot training or experience.

5. The Piper Comanche, number N8852P, was a single engine, four-seat aircraft. The plane was equipped for instrument flight. Also, the plane had two King communication radios allowing direct voice communication with ground facilities and with other aircraft. In addition, the plane had two King navigation radios, which provided guidance information from very high frequency omnidirectional range stations (VOR's). A VOR is a ground-based electronic navigation aid that transmits very high frequency signals, which are detected by an aircraft's equipment. The navigation radios could also be used for voice communication. Also, N8852P was equipped with an altimeter, which measured the aircraft's altitude above mean sea level. No evidence was presented to indicate that any malfunction of the aircraft's equipment or instruments contributed to the crash.

6. Flight service stations ("FSS's") are facilities operated by the Federal Aviation Administration (FAA), an agency of the federal government, at airports throughout the United States. FSS's provide various services to pilots, including weather briefings. The duties of an FSS specialist involve the providing of these services.

7. On April 25, 1985, the Dodge City FSS was a part time facility. The Dodge City FSS's published service hours were from 6:00 a.m. until 9:00 p.m. CST.

8. On April 25, 1985, FSS Specialist Kludas DeWayne Mead worked the last

shift at the Dodge City FSS. He worked from 1:00 p.m. to 9:00 p.m. CST. Mr. Mead was familiar with the weather conditions for that day. Throughout his shift, he had plotted weather information on weather depiction charts. Mead was an Air Traffic Control Specialist, FSS option. His duties included providing weather briefings to pilots who requested such information.

9. Air flights can be divided into two categories: flights under visual flight rules (VFR), and flights under instrument flight rules (IFR). The most accurate distinction in these flights is not one of good weather versus bad weather, but the conditions of clouds and visibility. VFR flights are limited to flights in which the pilot must visually see the horizon and control the aircraft by reference to what is visually seen. In IFR flights, the pilot controls the aircraft by reference to instruments in the aircraft. An IFR rated pilot may fly into weather conditions that prevent visual ground references. In IFR flights, the pilot uses radio navigational equipment to navigate the aircraft.

10. Weather conditions that require IFR flight, instrument meteorological conditions, exist when the cloud ceiling (the base of the cloud cover) is below 1,000 feet above ground level (AGL) or visibility is less than three miles. VFR weather conditions exist when the cloud ceiling is at least 1,000 feet AGL and visibility is at least three miles.

11. Throughout most of the day on April 25, 1985, a stationary front was located between Dodge City and Hill City. The front extended diagonally across the state of Kansas, from the northeast corner of Kansas down across the state to the northwest section of Texas. The front had varied very little in its location during the day.

12. At the time of Cunningham and Tinkler's departure from Dodge City, IFR weather conditions had developed generally north and west of the stationary front, while VFR weather conditions generally prevailed south and east of the front. Dodge City had VFR weather conditions at the time of departure. Earlier in the evening, a thunderstorm had passed through the Dodge City area. At 8:50 p.m. (shortly after N8852P's departure from the airport), Dodge City reported a scattered cloud ceiling of 6,500 feet AGL and a broken cloud ceiling of 25,000 AGL, with fifteen miles of visibility (VFR weather conditions).

13. A weather observer at Hill City had reported IFR weather conditions at 7:49 p.m. The cloud ceiling at Hill City was reported to be 600 feet AGL, overcast, and five miles visibility with some fog reported. This was the last report from Hill City for April 25, 1985. Other reported surface observations indicated that airports in the vicinity of N8852P's flight were in VFR weather conditions, including Russell, Garden City, Great Bend and Dodge City. According to the testimony of Dr. Ray Hoxit, a certified consulting meteorologist and defendant's weather expert, the transition from VFR weather conditions to IFR weather conditions along the route of N8852P's last flight was gradual. Ness City, approximately thirty-nine miles south of Wakeeney, was in VFR conditions, with generally clear skies. About fifteen miles north of Ness City, near Ransom, scattered low clouds with bases of 2,000 feet AGL started to form. Proceeding north, the clouds thickened and the ceiling became broken. About ten miles south of Wakeeney, overcast skies developed and IFR weather conditions developed. The bases of the cloud cover continued to lower until near Wakeeney, where the cloud bases were approximately 100 to 200 feet AGL. Because of this gradual transition from VFR weather conditions to IRF weather conditions, Pilot Cunningham would have been able to perceive the deteriorating conditions developing along the flight, and had an opportunity to turn around before entering the IFR weather.

14. The weather conditions at the crash site were IFR conditions. The cloud ceiling was between 100 to 200 feet AGL, and visibility was about one mile. Also, a light drizzle probably was falling in the area. This finding is based on the testimony of Dr. Hoxit and the witnesses who were near the crash site.

15. Pilot Cunningham, an experienced instrument rated pilot, was not confronted with any weather conditions along the flight route that exceeded either his capabilities or the operating limitations of his aircraft. He did not encounter icing conditions, turbulence or thunderstorms.

16. When N8852P left Dodge City, the weather conditions were appropriate for VFR flight. Pilot Cunningham intended to make the flight to Hill City a VFR flight. He filed no IFR flight plan with the Dodge City FSS.

17. Pilot Cunningham did not obtain a pre-flight weather briefing. Such a briefing can be obtained by contacting the FSS by telephone, visiting the station in person, or contacting the station by radio from the aircraft before departure.

18. At 8:36 p.m. and before takeoff, Cunningham requested and received from Specialist Mead a taxi advisory. The advisory informed the pilot of the wind direction and velocity at the airport and provided the correct altimeter setting for the Dodge City Airport.

19. Before closing the Dodge City FSS at 9:00 p.m., Mr. Mead began to take down and store weather data and charts. The computer terminal, which provided access to reported surface observations from area airports, remained available until Mead left the FSS at 9:00 p.m.

20. At 8:55 p.m. Specialist Mead issued his closing broadcast. In this broadcast, Mead reminded pilots in the area that the Dodge City FSS would be closing in five minutes.

21. At 8:55:58 p.m. CST, 0255:58 GMT, Pilot Cunningham contacted Specialist Mead by radio at the Dodge City Flight Service Station (DDC FSS). The following conversation occurred:

| TIME | PERSON SPEAKING | CONVERSATION |
|------|------|------|
| 0255:58 | N8852P | Dodge City Radio Comanche eight eight five two pop uh you still down there? |
| 0256:06 | DDC FSS | Eight eight five two pop go ahead. |
| 0256:08 | N8852P | Uh for you get outa there you got any weather up in the Hill City area this evening? |
| 0256:12 | DDC FSS | Why don't ya give Wichita a call on uh one two two point one, listen on the VOR, see if they can't update ya, everything we've gots already been put away and uh it'd be over one hour old anyway, but uh you can talk to Wichita through the Dodge VOR or the Hays or the Hill City. |
| 0256:27 | N8852P | Ok DeWain thank you sir, eight eight five two papa. |
| 0256:30 | DDC FSS | There uh everything (it'd) * be one hour old, they should be able to give ya some current weather here in just a few minutes and they can give ya updates on the uh radar. |
| (0257) | | |
| 0257:48 | DDC FSS | Eight eight five two pop Dodge, you still on the freq? |
| (0258) | | |
| (0259) | | |

This in-flight communication from Pilot Cunningham was not made during an emergency situation.

22. The weather information requested by Cunningham in this communication was available to Mr. Mead through the computer terminal in the Dodge City FSS. The data retrievable from the computer included the 7:49 p.m. surface observation from Hill City and also the area forecast. Mr. Mead could have accessed this information in a few seconds.

23. After this conversation with Mr. Mead, Mr. Cunningham never attempted to obtain weather information from the Wichita FSS or any other source of weather information. Various sources of weather information were available along the flight from Dodge City to Hill City. The Wichita, Russell and Garden City flight service stations operated on a twenty-four hour basis. Pilot Cunningham could have contacted these sources of weather information along the flight to Hill City. Cunningham could have contacted them by using his communication radios or his navigation radios operating through the VOR's. Also, a remote communications outlet (RCO) at the Hill City Airport provided a direct communication link to the Wichita FSS. An RCO at Hays provided a communications link to the Russell FSS. Pilot Cunningham could have contacted the Kansas City Air Route Traffic Control Center by using the remote

---

* This portion of the recording is not clear, but represents the best interpretation possible.

communications air/ground facilities (RCAG's) located at Natoma and Garden City. Also, the Denver Air Route Traffic Control Center was accessible by using the RCAG's at Colby or Natoma. Finally, communication with Kansas City Flight Watch could have been established through the Natoma RCAG. (An RCAG is an unmanned transmitter/receiver facility that is used to expand the Air Route Traffic Control Center's communications coverage and to facilitate direct contact between pilots and controllers.) All these facilities would not have been available to Cunningham at all times during the flight. However, some source was available to Cunningham throughout the flight.

24. At the time Cunningham made the request for weather information, 8:55 p.m., the aircraft was in the vicinity of Ness City. The court makes this finding based on the fact that the request came twenty minutes after N8852P had departed Dodge City. N8852P, at the time of this communication, was only a few minutes of flight time away from the accident site. The crash, however, did not occur until nearly an hour after this communication with Specialist Mead.

25. The events that transpired from the time of the communication with Mead until a few minutes before the crash are speculative. Plaintiffs' human factors expert, Mr. Richard Gilson and both plaintiffs' and defendant's pilot experts generally agree that Cunningham probably flew above the solid overcast north of the stationary front toward Hill City. Then finding Hill City covered by the solid overcast, the pilot returned to where the clouds were broken, a few miles south of Wakeeney, and attempted to proceed to Hill City by flying under the cloud ceiling. The cloud ceiling was dropping and ground elevation was rising as N8852P approached Wakeeney.

26. Randall Weller, an attorney and pilot from Hill City, was traveling in his automobile north on Highway 283 on the evening of April 25, 1985. At approximately ten miles south of Wakeeney, he saw the aircraft flying at approximately 500 feet AGL. The plane was heading north. Mr. Weller made special observation of the weather and the plane. He noted that the cloud ceiling was quite low. He observed broken clouds about ten miles south of Wakeeney. He testified that the clouds became a solid overcast about three miles south of Wakeeney.

27. Clarence Mai, Tim Hager, and Clarence Schnieder, all residing in or near Wakeeney, heard N8852P flying around the Wakeeney area shortly before the crash. Each testified that the plane sounded like it was flying very low or unusually low. Pilot Cunningham spent over ten minutes flying around the Wakeeney area at an extremely low altitude.

28. The crash occurred at approximately 9:50 p.m., one-half mile west of Wakeeney. The plane impacted the ground at a low angle. Pilot Cunningham simply flew the plane into the ground at a high speed. He was not attempting to land the plane at the time of the crash. Also, there is no evidence that Cunningham was experiencing vertigo or spacial disorientation at the time of the crash.

## CONCLUSIONS OF LAW
## AND ANALYSIS

### A. General Principles of Negligence in Kansas.

1. The court has jurisdiction over this case under the Federal Torts Claim Act, 28 U.S.C. § 1346(b). This action arises out of alleged governmental negligence occurring in Dodge City, Kansas. The plane crash occurred near Wakeeney, Kansas. The substantive tort law of Kansas applies to this case.

2. The ordinary rules of negligence apply to aircraft crashes. In re Hayden's Estate, 174 Kan. 140, 144, 254 P.2d 813, 816 (1953). In Kansas, the elements of actionable negligence are: (1) a duty owed by defendant to protect plaintiff from the suffered injury; (2) defendant's breach of this duty; (3) the breach of duty must be the actual and legal (proximate) cause of the injury; and (4) the plaintiff must have suffered damages. Baker v. City of Gar-

*den City*, 240 Kan. 554, 557, 731 P.2d 278, 280 (1987).

3. The legal cause (also called proximate cause) of an injury "is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act." *Id.*

4. If two acts of negligence are successive in time, a determination must be made on whether the intervening (later occurring) negligent act is a concurring cause of the injury or a superseding cause of the injury. If the intervening negligence is a concurrent cause, both tortfeasors are liable. If the later act of negligence is a superseding cause, the earlier tortfeasor is not liable. *Finkbiner v. Clay County*, 238 Kan. 856, 862, 714 P.2d 1380, 1384 (1986) (An intervening cause "supersedes a prior wrong as a cause by breaking the sequence of events between the original wrong and the injury received.")

5. Intervening negligent acts are superseding causes if they are unforeseen acts of gross negligence. *Citizens State Bank v. Martin*, 227 Kan. 580, 589, 609 P.2d 670, 676 (1980) ("Unforeseen acts of gross and wanton negligence [are] found to be such an intervening cause, and [ ] make the earlier negligence of other persons the remote cause to which no liability attaches ...") (citations omitted). When two distinct causes of an injury are successive in time, the original act being simple negligence and the subsequent act being gross and wanton negligence, the subsequent act is an independent and efficient superseding cause. *Id.* at 589, 609 P.2d at 677 (quoting *Hickert v. Wright*, 182 Kan. 100, Sly. ¶ 4, 319 P.2d 152, 154 (1957)).

### B. The Negligence of Plaintiff's Decedent.

6. Plaintiff's decedent in a wrongful death action is presumed to have exercised due care, and to possess the love of life. *Hagood v. Hall*, 211 Kan. 46, 49–50, 505 P.2d 736, 740 (1973). No evidence to rebut this presumption was ever presented.

Thus, the court finds no negligence on the part of James Tinkler.

### C. Negligence of Pilot Larry Cunningham.

7. The Federal Aviation Regulations ("FAR's") have the force and effect of law. *Tilley v. United States*, 375 F.2d 678, 680 (4th Cir.1967); *Davis v. United States*, 643 F.Supp. 67, 77 (N.D.Ill.1986), *aff'd*, 824 F.2d 549 (7th Cir.1987). The pilot of an aircraft is directly responsible for the operation of his aircraft. 14 C.F.R. § 91.3(a); *Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir.1972).

8. In the present case, Pilot Cunningham had a duty to obtain a pre-flight briefing of weather information before departing on his flight to Hill City. 14 C.F.R. § 91.5. ("Each pilot in command shall, before beginning a flight, familiarize himself with all available information concerning that flight.") Cunningham failed to comply with this duty. He did not contact Specialist Mead until he had already traveled for almost twenty minutes on the flight to Hill City.

9. Mr. Cunningham, as a pilot, was knowledgeable and trained in observing and evaluating actual weather that he perceived. *See* 14 C.F.R. § 61.105(a)(3); *Williams v. United States*, 504 F.Supp. 746, 750 (E.D.Mo.1980). Moreover, Cunningham had a continuing duty to be aware of the danger that he perceived with his own eyes. *Spaulding*, 455 F.2d at 227 ("A pilot cannot ignore the weather information he has been given or disregard the weather conditions he sees around him.") (footnote omitted). Pilot Cunningham had a duty to avoid adverse weather conditions. *Black v. United States*, 441 F.2d 741, 743 (5th Cir.), *cert. denied*, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971) (A pilot has an obligation "to observe, recognize, and to avoid the weather conditions which confront[ ] him.").

10. The FAR's establish minimum safe altitude requirements. 14 C.F.R. § 91.79. According to this regulation, a pilot cannot fly his aircraft over a city,

town, or settlement at an altitude below 1,000 feet above the highest obstacle within a 2,000 feet radius. *Id.* § 91.79(b). Over any other area, a pilot cannot fly below 500 feet AGL. *Id.* § 91.79(c). Therefore, Pilot Cunningham should have maintained an altitude of 1,000 feet AGL when flying over the city of Wakeeney, and at least (if the houses in the area do not constitute "settlements") 500 feet AGL when flying in the area surrounding Wakeeney. Cunningham was extremely and grossly negligent in flying around Wakeeney for approximately ten minutes at altitudes less than 100 to 200 feet AGL.

■ 11. Pilot Cunningham had a duty to use all available weather information. When he experienced deteriorating weather, Cunningham should have attempted to contact one of the various sources of weather information. *See Black,* 441 F.2d at 744. Pilot Cunningham was negligent in not attempting to contact one of the various available sources of weather information when he witnessed the gradual deterioration of weather conditions (the lowering cloud ceilings).

### D. The Negligence of Dodge City Flight Service Station.

■ 12. The FAA, through its agents, flight service specialists, has a duty to give a pilot information that the pilot requests. *Dyer v. United States,* 551 F.Supp. 1266, 1276 (W.D.Mich.1982). To fulfill its duty, the FAA must give a direct response to a pilot's request. See *Id.* at 1279; *Insurance Co. of Pa. v. United States,* 590 F.Supp. 435, 442 (S.D.Miss.1984) ("There is no doubt but that a duty existed on the part of the Terre Haute FSS to advise requesting pilots ... of weather conditions accurately and completely.") (citations omitted).

■ 13. Specialist Mead, at the Dodge City FSS, breached the duty to respond to Pilot Cunningham's request for weather information. Cunningham made a direct request for weather in the Hill City area. Mead had this information available at the time of the request. Specifically, Mead could have accessed information on the Hill City surface observations and area forecast from the computer terminal, which was still functioning at the time of Cunningham's request. Instead of directly responding to Cunningham's request, Mead directed Cunningham to contact the Wichita Flight Service Station for this information.

### E. Legal Cause.

14. "It is not enough to say the pilot and the controller are concurrently responsible [for accomplishing a safe flight], they must also be concurrently liable, and one does not necessarily follow from the other even if both are found negligent." *Roland v. United States,* 463 F.Supp. 852, 854 (S.D. Ind.1978).

■ 15. The negligence of Mead and the Dodge City FSS was not the legal (proximate) cause of N8852P's crash. The gross negligence of Pilot Cunningham was not only an intervening cause of the crash, but was a superseding cause. Cunningham's actions cut off the liability of any earlier negligence by the Dodge City FSS. *See Black,* 441 F.2d at 745 ("When the pilot saw the storm he had to make a decision either to proceed, to alter or reverse his course, or to land. His decision was to proceed. From then on can it be said that the failure of the [FSS] operator almost two hours earlier to warn him of [significant weather in the area] proximately contributed to that decision? We think not."); *Davis,* 643 F.Supp. at 78 ("The pilot's imprudent flight into adverse weather conditions cuts off any chain of causation linking any negligence on the part of the weather briefer and the subsequent crash.") (citing *Black.*)

16. The court realizes that the facts of the present case present a situation not previously addressed in any reported decision. None of the cases cited by either side for support are on point. *See Himmler v. United States,* 474 F.Supp. 914, 931 (E.D. Pa.1979) ("If our review of many aviation cases has demonstrated any one important truism, it is that each aircraft accident must be considered in light of its own particular circumstances.") (citations omitted).

However, the court finds that the *Black* and *Davis* decisions are more analogous to the present situation than the authorities on which plaintiffs rely. In *Black*, the Fifth Circuit faced a situation very analogous to the present case. The FSS specialist in *Black* breached an affirmative duty to warn the pilot of significant weather conditions. The court held, however, that this breach of duty was not the proximate cause, for the pilot was aware of the weather conditions he was entering and consciously chose to enter the weather system. This act by the pilot was found to cut off any liability on the FAA for its earlier breach of duty. *Black*, 441 F.2d at 746.

Another helpful case is *Insurance Co. of North Am. v. United States*, 527 F.Supp. 962 (E.D.Ark.1981). The facts in that case involved a very experienced IFR-rated pilot who flew his plane into the ground. The pilot had been flying the IFR flight at 5,000 feet. For some unknown reason, the pilot descended and attempted to operate the aircraft under a low overcast at only a couple of hundred feet above the ground. *See id.* at 968. The court found that the decision "to abandon his altitude and descend to the ground, whether intentional or inadvertent, constituted substantial negligence on the part of the pilot." *Id.* at 971. The plaintiff claimed that the air traffic controllers were negligent in causing a delay and allowing the pilot to enter adverse weather because two air traffic control centers were engaged in a jurisdictional dispute over who should be responsible for the plane. The court found that even if the air traffic controllers were negligent, the pilot's negligence in descending and attempting to fly at extremely low altitudes was the superseding cause of the crash. *Id.* at 972.

The cases on which the plaintiffs rely, finding the FAA liable, involved factual situations quite different from the one presented here. In most of those cases, the presence of the FAA employees was immediate to the crash; there was a direct link between the FAA employee's action and the resulting crash. These cases involve aircraft attempting to land at a facility and pilots in contact with FAA employees during emergency situations. *See, e.g., Watkins, et al. v. Federal Aviation Admin.*, No. 86–1742, slip op. at 12–13, 25 (W.D.La., *unpublished*, June 26, 1987) (landing situation and controller knew pilot was in need of assistance); *Dyer, supra* (landing in emergency situation); *McCullough v. United States*, 538 F.Supp. 694, 695 (E.D.N.Y.1982) (landing); *Himmler*, 474 F.Supp. at 931 (emergency); *Martin v. United States*, 586 F.2d 1206 (8th Cir.1978) (controllers in contact with pilot immediately before crash, and conveyed many pieces of incorrect information); and *Ingham v. Eastern Airlines, Inc.*, 373 F.2d 227, 233 (2d Cir.), *cert. denied*, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967) (erroneous weather information conveyed twelve minutes before crash, which occurred during an attempted landing).

In the present case, the presence of the FAA's negligence was remote and not directly linked to the crash. Pilot Cunningham's communication with Mr. Mead was not made during an emergency situation. Moreover, the FAA's negligence was cut off by the pilot's superseding negligence. The court cannot, in light of the law and the facts presented, find the FAA's negligence to be a legal cause of N8852P's crash.

■ 17. The negligent acts of Pilot Cunningham were unforeseen acts of gross negligence. FSS Specialist Mead was not required to foresee negligent or grossly negligent acts of pilots. *See Colorado Flying Academy, Inc. v. United States*, 506 F.Supp. 1221, 1228 (D.Colo.1981), *aff'd*, 724 F.2d 871 (10th Cir.1983), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986); *Davis*, 643 F.Supp. at 77. An FSS specialist may rely on the assumption that a pilot knows and will abide by all appropriate FAR's. *Colorado Flying Academy, Inc.*, 506 F.Supp. at 1228.

Here, the negligent acts of Pilot Cunningham were not foreseen by Mead. Mr. Mead expected Cunningham to take his advice and contact Wichita. Cunningham made no such attempt. (Plaintiff's pilot and causation expert, Jack J. Eggspuehler,

testified on cross-examination that he would have expected Mr. Cunningham to attempt to contact Wichita at Mead's suggestion.) Moreover, Mead could not foresee that Cunningham would attempt to continue his flight under very low overcast cloud ceilings, and would fly for an extended period of time below FAR minimum altitudes.

18. Pilot Cunningham's negligence in placing his aircraft in a place of peril and flying his aircraft at extremely low and unsafe altitudes was the legal cause of the crash. Specialist Mead's negligent act, occurring almost an hour before the crash, in not directly conveying to the pilot weather information that the pilot requested was not a legal cause of the crash.

19. Defendant, the United States, is not liable for damages resulting from the April 25, 1985 crash of N8852P.

## CONCLUSION

The court commends all counsel involved in this case for submitting very well argued trial briefs. The court finds, however, that the law which must be applied and the facts when applied to that body of law compel the court to find defendant not liable for the tragic crash of N8852P.

The court has struggled with this case for some time. I would like to be able to award this widow and her children some damages. This family has suffered a great loss with the death of a self-motivated, hardworking and devoted young husband and father. Unfortunately, sympathy alone is not adequate authority for this court to award damages. As Judge Kane once remarked, "I have given these arguments long, serious and frequent consideration. Inevitably, however, I return to the fundamental precept that I must apply the law as I see it and not as I wish it to be." *Colorado Flying Academy, Inc.,* 506 F.Supp. at 1228. Viewing the facts in evidence, the United States is not liable for N8852P's crash and the resulting wrongful death of James E. Tinkler, III.

IT IS BY THE COURT THEREFORE ORDERED that the Clerk of the District Court enter judgment in favor of the defendant.